**JOHANNA FARMS, INC., Plaintiff,**

v.

**CITRUS BOWL, INC., and Tropicana Products, Inc., Defendants.**

No. 78 C 286.

United States District Court,
E. D. New York.

May 25, 1978.

---

Bell, Wolkowitz, Beckman & Klee, New York City, for plaintiff.

Burns, Doane, Swecker & Mathis, Alexandria, Va., for defendants.

## MEMORANDUM AND ORDER

BRAMWELL, District Judge.

The matter at hand concerns the first step taken in an action commenced by Johanna Farms, Inc. (hereinafter "Johanna") against Citrus Bowl, Inc. and Tropicana Products, Inc. (hereinafter "Tropicana") for permanent injunctive relief, an accounting of profits, and for punitive as well as compensatory damages. The claim upon which this relief is predicated sounds in common law trademark infringement, unfair competition and a violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1970).

The focal point of this controversy is centered upon the use of the trademark PURE MAID and the diamond stylized logo associated therewith in the sale and distribution of citrus drinks in a limited geographical market comprised of seven states in the northeastern and middle atlantic region of the United States. Thus, the basic problem that has arisen is the presence of two unyielding competitors vying for the same spot in the marketplace. In its complaint, Johanna alleges a superior right to use this mark in this circumscribed market and, as evidence of this right, points to nearly eight years of allegedly uninterrupted exclusive use in promoting and selling both orange and grapefruit juices under this label. In support of its claim, plaintiff alleges that the continued sale of the defendants' product under the PURE MAID mark and logo will destroy the value of the mark and will irreparably injure the business it has established. Plaintiff further complains that the defendants' product is debasing its reputa-

tion as the defendants' product is inferior to its own. They argue that consumers will impute their dissatisfaction with the defendants' product to the plaintiff.

Plaintiff buttresses its assertion of a superior right to the PURE MAID mark by laminating this claim with a stratum of defenses. Initially, the plaintiff argues that the defendants are presently precluded from asserting any right or assailing the underlying soundness of the plaintiff's claimed right as the PURE MAID mark was freed of any restraints placed upon its use by virtue of an abandonment. Specifically, the plaintiff submits that the near eight year delay by the defendants in asserting their purported title to PURE MAID coupled with their knowledge of the plaintiff's use of the mark evidences the defendants' intent to abandon the mark as a matter of fact. The plaintiff further maintains that the Trustee of Juice Corporation of America, the first business to use the mark, sold the mark in gross thereby precipitating the abandonment of the goodwill and the consequential destruction of the mark as a matter of law.

Underlying this defense is yet another layer to the wall which is claimed to foreclose the defendant from presently stepping forward under a color of right. Plaintiff insists that the silent passage of time begat prejudice in that during these eight years, it labored hard at the sowing and nurturing of its business under the PURE MAID mark. It is simply unfair, plaintiff argues, to presently allow the defendants to harvest the fruits of this labor. Therefore, plaintiff concludes, the defendants' inertia demands the application of the doctrine of laches.

Despite the defendants' admission of Johanna's use of PURE MAID, they vigorously dispute the plaintiff's claim of the right to use this mark. Initially, they allege that the defendants, not the plaintiff, possess the title and the right to use this mark through their purchase of the mark at the aforementioned bankruptcy sale. Furthermore, they argue that neither the passage of time nor the use by the plaintiff can divest them of this right as the specter of

bad faith lurks within the plaintiff's act of appropriation and subsequent use. Finally, they contend that the plaintiff's claim of abandonment as a matter of fact is not supported by the facts and that the claim of abandonment as a matter of law in view of the facts is not only devoid of any merit but is also purely speculative at this juncture. Although the defendants did not in turn cross-move for preliminary relief, the plaintiff's claim did prompt them to counterclaim for permanent injunctive relief barring the plaintiff from further use of the PURE MAID mark, an accounting of profits, and both compensatory and punitive damages.

In starting down the path of litigation, the plaintiff immediately approached the bench for the issuance of a preliminary injunction which would prohibit the defendant from further use of PURE MAID in the market area claimed to be the plaintiff's own. Following a hearing on this motion, the requested relief was denied and although no final conclusions may be drawn in advance of trial, the Court stated that a written opinion expounding on the reasons for this denial would follow. In fulfilling this promise herein, and in accordance with Rule 52 of the Federal Rules of Civil Procedure, the Court's bench ruling was based upon the following findings of fact and conclusions of law.

I

FINDINGS OF FACT

1) Johanna Farms, the plaintiff herein, is a New Jersey corporation with a principal place of business in Flemington, New Jersey. The amount in controversy, exclusive of interest and costs, is in excess of $10,000.

2) Citrus Bowl, Inc., a defendant herein, is a New York corporation with a principal place of business in Whitestone, New York.

3) Tropicana Products, Inc., a defendant herein, is a Florida corporation having its principal place of business in Bradenton, Florida.

4) The trademark PURE MAID is of sufficient distinctiveness to entitle it to protection.

5) Insofar as it is germane to this action, the trademark PURE MAID and its symbolic logo were first adopted and used in as early as 1957 on citrus drinks by Juice Corporation of America (hereinafter "JCA").

6) Kurt Goldman, who was the president of plaintiff in 1967 and who remains in that position to date, knew that the PURE MAID mark had been adopted and used by JCA prior to its use by the plaintiff. As early as 1967, plaintiff had transacted business with JCA through the purchase of fruit concentrate from JCA.

7) During 1968, JCA experienced financial difficulties which culminated in the institution of bankruptcy proceedings. Consequently, the PURE MAID mark became vested in the trustee in Bankruptcy as an asset of the estate.

8) Murry Verlin was the president of JCA at or around the time of the commencement of JCA's bankruptcy proceedings. He was first introduced to Mr. Goldman in 1967 and later transacted business with Mr. Goldman in the aforementioned sale of frozen concentrate. In late 1969, in the midst of JCA's bankruptcy proceedings, Mr. Verlin became associated with the plaintiff as a broker for Johanna.

9) In 1968, the defendant Tropicana entered into an agreement with JCA's trustee whereby Tropicana was granted the right to use the PURE MAID mark in connection with its European market operations. Said agreement was confirmed by the Bankruptcy Court on February 29, 1968. The Court's order specifically stated that notice of the agreement had been given to Mr. Verlin. Furthermore, the order categorically stated that said order was not intended to affect the disposition by the Trustee of the United States rights of the bankrupt in the PURE MAID mark.

10) Before January of 1970, Mr. Goldman learned of JCA's bankruptcy. According to Mr. Goldman, Mr. Verlin approached Mr. Goldman in January of 1970 and told him to use the PURE MAID label. Knowing of JCA's prior use of PURE MAID, at least in New York, and the goodwill established through this use, Mr. Goldman testified that he decided to use the mark intending to capitalize on this goodwill.

11) At some point thereafter, Mr. Goldman investigated the alleged use of PURE MAID in Europe by an unidentified Detroit based corporation. However, he did not investigate and the evidence does not reflect whether PURE MAID was being used by or under the direction of the Trustee in the domestic market. Furthermore, Mr. Goldman did not seek the advice at this time of the Trustee or an attorney with respect to his contemplated use.

12) Other than the Trustee's agreement with Tropicana, no evidence was submitted as to the use, non-use, or improper use of the subject mark by the Trustee or others.

13) In January of 1970, the same month in which Mr. Verlin approached Mr. Goldman, the plaintiff ordered the manufacture of PURE MAID caps, exhibits 1 and 2 in evidence. Within ten days of receipt of these caps on April 9, 1970, said caps were used on bottled juice products which were subsequently distributed in New York and possibly other states. Since April of 1970, the plaintiff has used and continues to use the PURE MAID mark on its juice products which are disseminated in New York, New Jersey, Delaware, Pennsylvania, the District of Columbia, Maryland and Connecticut.

14) Subsequent to April of 1970, Mr. Goldman became aware of a bankruptcy sale concerning JCA's estate at which the Trustee planned to sell the rights in the PURE MAID mark. In July of 1970, this sale was held. Mr. Goldman testified that he attended this sale and bid on the mark with the intent of purchasing whatever rights existed in the mark. Despite the fact that Mr. Goldman offered the highest bid of $11,500 for the domestic use and concomitant goodwill of PURE MAID, Tropicana was awarded the title as it was the highest bidder for the combined domestic and foreign rights to the use of the mark.

15) The documents confirming the purchase by Tropicana of the rights in the PURE MAID mark explicitly recite a trans-

fer of the goodwill associated therewith. Among the rights transferred to Tropicana were the trademark registrations of PURE MAID in New York and Florida. The New York registration has subsequently lapsed.

16) After the July 1970 sale and with knowledge of its loss on its bid to Tropicana of the domestic use of PURE MAID, the plaintiff continued to employ PURE MAID in its distribution of juice products in the aforementioned states.

17) From 1970 to date, the plaintiff has extensively advertised its juice products under the label PURE MAID and has provided promotional allowances to its customers for their advertising of PURE MAID. From 1970 to date, the plaintiff has had somewhere between four and five million dollars in sales of their grapefruit and orange juice under the PURE MAID label in the aforementioned states.

18) In a letter dated September 10, 1970, Tropicana informed the plaintiff of its intention to use the PURE MAID mark and to take the necessary steps to protect their interests in PURE MAID.

19) Consequently, on November 30, 1970, a meeting was held between plaintiff's and defendants' counsel. At this meeting, each party claimed the right to use the PURE MAID mark. Despite the fact that neither side acceded to the other party's position, no legal action was instituted by either party at this time.

20) At the time of this meeting, plaintiff and its attorneys knew of Tropicana's acquisition of all of the rights in PURE MAID from JCA's Trustee in Bankruptcy and that JCA then had registrations of PURE MAID in New York and Florida.

21) No further meeting or correspondence transpired between the parties until the commencement of the instant action. In January of 1978, the plaintiff became aware of the sale in New York by the defendants of a frozen concentrate orange drink under a diamond stylized label of PURE MAID, and, shortly thereafter, it commenced the instant action on February 15, 1978.

22) The label employed by the plaintiff contains the word PURE MAID in white letters superimposed on green diamonds. The label on the defendants' product contains the word PURE MAID in green letters superimposed on white diamonds. The plaintiff's product is ready made and is sold in cartons. The defendants' product is a frozen concentrate sold in small can-type containers.

23) After having compared the marks and the parties' goods upon which the marks are used, it is found that the trademark PURE MAID and the logo employed by each party respectively are of such similarity that there exists a likelihood of confusion to the public in the relevant geographic market. However, there is no evidence that the plaintiff ever offered its product for sale or distribution in a frozen concentrate form. Similarly, there is no evidence that the defendants offer their product in a ready-to-serve form.

24) The plaintiff's ready-to-serve juice product consists of 100% pure orange or grapefruit juice. Thus, it is devoid of artificial color, sugar or other additives. The face of plaintiff's label in bold print clearly reflects this composition.

25) Tropicana's frozen concentrate orange drink consists of 50% orange juice to which is added numerous and sundry additives including sugar. The face of the Tropicana label reflects in large, bold type that it is an orange drink containing 50% orange juice.

## II

### CONCLUSIONS OF LAW

*General Discussion*

■ Prior to reaching the merits of the instant motion, the threshold question of this Court's jurisdiction must be settled. Since the plaintiff's claim falls within the scope of protection afforded by section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), this Court has jurisdiction to entertain this matter pursuant to 15 U.S.C. § 1121 (1970).

Section 43(a) of the Lanham Act provides:

*False designations of origin and false descriptions forbidden*

(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation or origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1121 (1970). The underlying purpose of this section is to protect consumers and competitors from misrepresentations of products and services in commerce. *C.B.S. Inc. v. Springboard International Records,* 429 F.Supp. 563, 566 (S.D.N.Y. 1976). Its protection is often invoked in cases alleging harm from misappropriation or misuse of a trademark. *American Home Products Corp. v. Johnson and Johnson,* 436 F.Supp. 785, 790 (S.D.N.Y. 1977). Under section 43(a) of the Lanham Act, a Court has the power to grant a preliminary injunction despite the fact that the trademark in dispute is not a federally registered mark. *FRA S.p. A. v. Surg–O–Flex of America, Inc.,* 415 F.Supp. 418, 420 (S.D. N.Y. 1975); *Apollo Distributing Co. v. Apollo Imports Inc.,* 341 F.Supp. 455, 458 (S.D. N.Y. 1972). Furthermore, since the plaintiff's citizenship is diverse from the defendants' citizenship and the amount in controversy, exclusive of interest and costs, exceeds $10,000, jurisdiction for the common law claims asserted herein may be predicated on 28 U.S.C. § 1332 (1970). *John Wright, Inc. v. Casper Corp.,* 419 F.Supp. 292, 315 (E.D.Pa.1976).

■■ As to the nature of the relief requested herein, initially it is to be noted that the purpose of a preliminary injunction is to maintain the status quo pending a final determination on the merits. *Triebwasser & Katz v. American Telephone & Telegraph Co.,* 535 F.2d 1356, 1360 (2d Cir. 1976); *Gulf and Western Industries, Inc. v. Great Atlantic & Pacific Tea Co.,* 476 F.2d 687, 692 (2d Cir. 1973); *Checker Motors Corp. v. Chrysler Corp.,* 405 F.2d 319, 323 (2d Cir. 1969); *Unicorn Management Corp. v. Koppers Co.,* 366 F.2d 199, 204 (2d Cir. 1966). A preliminary injunction, being a child of equity, will not issue as a matter of right, *Yakus v. United States,* 321 U.S. 414, 440, 64 S.Ct. 660, 88 L.Ed. 834 (1944), but is subject to the exercise of the sound discretion of the Court after a careful review of the underlying equities, *see Checker Motors Corp., supra* at 323.

■ Traditionally, a preliminary injunction has been considered by the Courts to be a somewhat drastic and extraordinary remedy. *Medical Society of New York v. Toia,* 560 F.2d 535, 538 (2d Cir. 1977). Consequently, this relief will be denied absent a clear showing that the movant has met his burden of proof. *See id.; Dopp v. Franklin National Bank,* 461 F.2d 873, 878 (2d Cir. 1972); *Checker Motors Corp., supra* at 323. In entering an Equity Court in search of a preliminary injunction, the movant must persuade the court that there exists

(1) probable success on the merits *and* possible irreparable injury or

(2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of the hardships tipping decidedly toward the party requesting the preliminary relief.

*Sonesta Int'l Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir. 1973) (emphasis in original). *Accord, New York Association of Homes for the Aging v. Toia,* 559 F.2d 876, 880 (2d Cir. 1977); *Jacobson & Co., Inc. v. Armstrong Cork Co.,* 548 F.2d 438, 441 n.2 (2d Cir. 1977); *Triebwasser & Katz, supra* at 1358; *Gulf & Western Indus-*

tries, Inc., supra at 692–93. Although this test is couched in general terms, it is the test to be applied in determining the propriety of issuing a preliminary injunction in a trademark infringement case. See Charlie's Girls, Inc. v. Revlon, Inc., 483 F.2d 953, 954 (2d Cir. 1973); Menley & James Laboratories, Ltd. v. Approved Pharmaceutical Corp., 438 F.Supp. 1061, 1066 (N.D.N.Y. 1977). In a trademark case, an additional factor to be considered in conjunction with a request for a preliminary injunction is the public interest in the mark. American Motorists Ins. Co. v. City Wide Transportation, 308 F.Supp. 1080, 1084 (S.D.N.Y.1969).

■ However, before any form of equitable relief may issue, it is axiomatic that one who seeks Equity's assistance must stand before the court with clean hands in the acquisition of the right he is seeking to protect. E. g., Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 814–815, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); Republic Molding Corp. v. B. W. Photo Utilities, 319 F.2d 347, 349–50 (9th Cir. 1963); New York Football Giants, Inc. v. Los Angeles Chargers Football Club, Inc., 291 F.2d 471, 473–74 (5th Cir. 1961). Tying this maxim to the motion at hand, of significance is the Second Circuit's statement in Colligan v. Activities Club of New York, Ltd., 442 F.2d 686 (2d Cir.), cert. denied, 404 U.S. 1004, 92 S.Ct. 559, 30 L.Ed.2d 557 (1971):

The [Lanham] Act's purpose as defined in § 45, is exclusively to protect the interests of a purely commercial class against unscrupulous commercial conduct.

Id. at 692. Thus, if the party invoking the Act's protection has participated in unscrupulous commercial conduct, it has been held that he is not entitled to avail himself of its protections as

[t]o permit a suitor with unclean hands to obtain injunctive relief would run afoul of the legislative goals [of section 43(a).]

Ames Publishing Co. v. Walker-Davis Publications, Inc., 372 F.Supp. 1, 13 (E.D.Pa. 1974).

■ Turning to the substance of the claim asserted herein, preliminarily it is to be noted that the mere adoption of a trademark will not result in the acquisition of rights therein. The birth of a recognizable and protectable right is characterized not only by adoption but by the use of the mark, the use being the affixation of the mark to goods and the distribution of said goods in commerce. United Drug Co. v. Rectanus Co., 248 U.S. 90, 97, 39 S.Ct. 48, 63 L.Ed. 141 (1918); Huber Baking Co. v. Stroehmann Brothers, Co., 252 F.2d 945, 955 (2d Cir. 1958); Coit Drapery Cleaners, Inc. v. Coit Drapery Cleaners of New York, 423 F.Supp. 975, 978 (E.D.N.Y.1976). For one to acquire trademark rights in this fashion, however, it is essential that his initial adoption and use of the mark be colored by good faith. United Drug Co., supra, 248 U.S. at 101, 39 S.Ct. 48; Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 415, 36 S.Ct. 357, 60 L.Ed. 713 (1916); Ubeda v. Zialcita, 226 U.S. 452, 454, 33 S.Ct. 165, 57 L.Ed. 296 (1913); Grotrian, Helfferich, Schulz Th. Seinweg Nachf v. Steinway & Sons, 523 F.2d 1331, 1336–39 (2d Cir. 1975).

■ Of similar general significance to the instant matter is that upon the bankruptcy of the trademark owner, the trademark together with the goodwill it symbolizes becomes vested in the Trustee in Bankruptcy, 11 U.S.C. § 110(a)(2) (1940), and may be sold by him as an asset of the estate. Mutual Life Insurance Co. v. Menin, 115 F.2d 975, 977 (2d Cir. 1940); United States Ozone Co. v. United States Ozone Co. of America, 62 F.2d 881, 885–86 (7th Cir. 1932); Woodward v. White Satin Mills Corp., 42 F.2d 987, 990 (8th Cir. 1930); Merry Hull & Co. v. Hi-Line Co., Inc., 243 F.Supp. 45, 50 (S.D.N.Y.1965). It follows, therefore, that the goodwill of the insolvent's mark is not automatically destroyed upon his adjudication of bankruptcy. Merry Hull & Co., supra; Reconstruction Finance Corp. v. Menihan Corp., 22 F.Supp. 180, 182 (W.D.N.Y.1938). Cf. Beech Nut Packing Co. v. Lorillard Co., 273 U.S. 629, 632, 47 S.Ct. 481, 71 L.Ed. 810 (1927). Upon the valid sale of this asset, the legitimate purchaser becomes transfixed to the position of his predecessor, enjoying the latter's

rights in the mark dating from its initial use and suffering the burdens on and limitations of its use that were incumbent on his predecessor. *See Donnell v. Herring-Hall-Marvin Safe Company*, 208 U.S. 267, 273, 28 S.Ct. 288, 52 L.Ed. 481 (1908); *Herring-Hall-Marvin Safe Co. v. Hall's Safe Co.*, 208 U.S. 554, 557–58, 28 S.Ct. 350, 52 L.Ed. 616 (1908); *Consumers Petroleum Co. v. Consumer's Co. of Illinois*, 169 F.2d 153, 156 (7th Cir. 1948); *California Packing Corp. v. Sun-Maid Raisin Growers of California*, 81 F.2d 674, 676 (9th Cir. 1936). With these basic precepts in mind, plaintiff's first contention that it is entitled to the preliminary assistance of Equity's hand in pursuing its infringement claim is ripe for discussion.

### Plaintiff's Claim of Priority

■ Where claimants dispute the right to use a particular trademark, the general rule is that priority of appropriation and use determines which litigant will prevail in its use. *United Drug Co., supra*, 248 U.S. at 100, 39 S.Ct. 48. In the instant case, the mechanical application of this rule to the plaintiff's alleged right would prove defeating at the outset. Here, it is uncontroverted that PURE MAID was adopted and used by JCA prior to any use of it by the plaintiff. The defendants, being JCA's ostensibly valid successors in interests, therefore stand in the shoes of JCA. It is also not contested that upon the purchase of the disputed mark in 1970, the defendants began to exploit its benefits on the European market and in regions within the United States. Consequently, the plaintiff cannot predicate its alleged right to PURE MAID on priority of appropriation and use as the plaintiff was not the first to adopt and use it to distinguish its own products from similar products manufactured by others. Therefore, if the plaintiff possesses a superior right in PURE MAID, this right must stem from the application of another rule of law. Accordingly, the exception to this priority rule must be considered and applied to the facts herein.

■ Under the established exception to the priority rule, where a junior user is the first to adopt the disputed mark in a limited geographical area, he may thereby be entitled to exclusively exploit the mark in that limited area. *United Drug Co., supra* at 101, 39 S.Ct. 48; *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 362 (2d Cir. 1959). This exception was carved out of the steadfast priority rule and was succinctly set forth in the seminal decision of *United Drug Co. v. Rectanus Co., supra* at 100, 39 S.Ct. at 52.

> The reason for the [priority] rule does not extend to a case where the same trademark happens to be employed simultaneously by two manufacturers in different markets separate and remote from each other, so that the mark means one thing in one market, an entirely different thing in another. It would be a perversion of the rule of priority to give it such an application in our broadly extended country that an innocent party who had in good faith employed a trade-mark in one state, and by the use of it had built up a trade there, being the first appropriator in that jurisdiction, might afterwards be prevented from using it, with consequent injury to his trade and good will, at the instance of one who theretofore had employed the same mark, but only in other and remote jurisdictions, upon the ground that its first employment happened to antedate that of the firstmentioned trader.

*See Hanover Star Milling Co., supra* at 415, 36 S.Ct. 357.

Of initial note is that under the facts presented herein, the plaintiff admits that it was not the first user of the mark in New York. Although no evidence was presented as to the exploitation of the mark by JCA in the other states encompassed in the geographical sphere claimed to be the plaintiff's market, it may be that, at least in New York, the plaintiff is neither a senior nor a junior user as it was not the first appropriator of the mark in that region. Thus, it may be that with respect to the New York use, plaintiff may not be able to claim the applicability of the junior user

exception unless the defendants' lack of use in New York entitles the plaintiff to this protection.

▮ Nevertheless, as to the other states and perhaps as to New York, as clearly illustrated in the above passage, an important variable to consider in cases where a trademark right no longer rests upon the calendar date of the senior's use is the good faith of the junior user in employing the disputed mark. Accordingly, it has become a rudimentary precept that in order to invoke the equitable protection afforded by this exception, a junior user must have adopted the mark in good faith without knowledge of the originator's claim to the mark, that is, without the intent of copying it or profiting from the efforts of the originator and, therefore, without intending or reasonably anticipating confusion. *See United Drug Co., supra* at 101, 39 S.Ct. 48; *Ubeda, supra*, 33 S.Ct. at 166; *Fry v. Layne Western Co.*, 282 F.2d 97, 105 (8th Cir. 1960); *Pike v. Ruby Foo's Den, Inc. of Maryland*, 232 F.2d 683, 686, 98 U.S.App.D.C. 126, 129 (D.C.Cir. 1956); *White Tower System Inc. v. White Castle System of Eating Houses Corp.*, 90 F.2d 67, 70 (6th Cir. 1937); *R. H. Macy & Co. v. Colorado Clothing Mfg. Co.*, 68 F.2d 690, 692 (10th Cir. 1934); *Western Oil Refining Co. v. Jones*, 27 F.2d 205, 206 (6th Cir. 1928); *Buckspan v. Hudson's Bay Co.*, 22 F.2d 721, 723 (5th Cir. 1927); *Sweet Sixteen Co. v. Sweet "16" Shop*, 15 F.2d 920 (8th Cir. 1926); *Big O Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 408 F.Supp. 1219, 1239 (D.C.Colo.1976), *modified on damages*, 561 F.2d 1365 (10th Cir. 1977); *Londontown Manufacturing Co. v. Cable Raincoat Co.*, 371 F.Supp. 1114, 1119 (S.D.N.Y.1974); *Field Enterprises Educational Corp. v. Grosset & Dunlap, Inc.*, 256 F.Supp. 382, 389 (S.D.N.Y.1966); *H. M. H. Publishing Co., Inc. v. Turner*, 222 F.Supp. 145, 150 (N.D.Ga.1963), *aff'd*, 380 F.2d 224 (5th Cir.), *cert. denied*, 389 U.S. 1006, 88 S.Ct. 566, 19 L.Ed.2d 601 (1967). *Cf. Aluminum Fabricating Co. v. Season-All Window Corp.*, 259 F.2d 314, 317 (2d Cir. 1958). If it is found that the junior user did not adopt the mark in good faith, he will not be accorded the right to exploit the mark, even in areas previously untouched by the senior user. *See Ubeda, supra* at 166; *Fry, supra* at 105, 106.

In deciding whether the plaintiff herein has cleared the initial hurdle of good faith that stands before it, the facts elucidated in this matter must be examined. It is uncontroverted that the plaintiff knew of JCA's prior use of PURE MAID as indeed this was admitted by Mr. Goldman, its president, and the evidence reflects that the plaintiff had transacted business with JCA. Similarly, at the time that it appropriated the mark, plaintiff knew that JCA was in the midst of bankruptcy. Although the plaintiff investigated the alleged use of the mark on the European market, no inquiry was conducted regarding its possible use in the United States. Further, Mr. Goldman testified that at the time he was contemplating the appropriation and use of the mark, he was concerned about exploiting the mark in contravention to one with superior rights. Nonetheless, he admitted that he did not seek the advice of the Trustee or an attorney as to the propriety of his prospective use. Instead of allaying these fears through any investigation, Mr. Goldman testified that he blindly accepted the word of Mr. Verlin that the mark could be used. Indeed, he implemented Mr. Verlin's suggestion almost immediately as, within the same month of the above conversation, he ordered the caps for use in the marketing of the subject juices. A further and rather bizarre fact that emerges from Mr. Goldman's testimony is that although he offered the bid of $11,500 for the rights in PURE MAID at the bankruptcy sale, no money was paid to Mr. Verlin for the rights claimed to be his. From the totality of Mr. Goldman's guarded and somewhat equivocal testimony regarding the initial adoption of the mark, the Court was left with the colorfully distinct yet non-verbal impression that, like Marcellus in *Hamlet*, Mr. Goldman knew at that time that "[s]omething is rotten in the state of Denmark."

Moreover, it is equally clear that the defendants purchased the disputed mark at an ostensibly valid bankruptcy sale which enti-

tled them to reap the benefits of JCA's prior use. Similarly, it is irrefutable that the plaintiff knew of the defendants' claim to PURE MAID as Mr. Goldman not only attended the bankruptcy sale at which the mark was sold right before his eyes to the defendants, but he actively vied for its title by offering a substantial bid for the same, despite the fact that Mr. Goldman now claims that he knew then that the mark was worthless. Moreover, after leaving the sale as a defeated bidder, the plaintiff nonetheless proceeded to exploit the sold trademark. Finally, but of significant importance, Mr. Goldman testified that his appropriation and use of the PURE MAID mark was motivated by his intent to commandeer the goodwill of the mark that had been earned over the years through the substantial labor of JCA. Such an intention, coupled with the knowledge of the defendants' claim to the mark, tends to negate an inference of good faith for, as noted by the Second Circuit, an innocent or good faith user is one

> whose use is not attributable to intent to obtain a free ride on the reputation of the owner of the trade-mark.

*Triumph Hosiery Mills, Inc. v. Triumph International Corp.*, 308 F.2d 196, 199 (2d Cir. 1962).

In light of these facts, plaintiff's appropriation of the PURE MAID mark appears to be cast in the shadow of bad faith. Indeed, if a junior's use of a mark in the face of constructive notice of the senior's use by virtue of the federal registration of the mark negates an inference of good faith, *see Dawn Donut Co., supra* at 362, then actual notice of another's claim to the mark must demand a similar conclusion, *see Aluminum Fabricating Co., supra* 160 F.Supp. 41 at 46 (D.C.). Consequently, since equity frowns upon one cast in this shadow, at this early stage in the litigation, the Court will not permit the plaintiff to cloak itself in the equitable veil of the junior user exception. *See Hanover Star Milling Co., supra*, 240 U.S. at 415, 36 S.Ct. 357; *United Drug Co., supra*, 248 U.S. at 101, 39 S.Ct. 48; *Baker v. Simmons Co.*, 307 F.2d 458, 465 (1st Cir. 1962); *National Van*

*Lines, Inc. v. Dean*, 288 F.2d 5, 10 (7th Cir. 1961); *Harold F. Ritchie, Inc. v. Chesebrough-Pond's Inc.*, 281 F.2d 755, 758 (2d Cir. 1960); *Big O Dealers, Inc., supra* at 1239; *Atlantic Monthly Co. v. Frederick Ungar Publishing Co., Inc.*, 197 F.Supp. 524, 531–32 (S.D.N.Y.1961). *Cf. Triumph Hosiery Mills, Inc., supra* at 199.

### Plaintiff's Claim of Abandonment

The plaintiff's argument that the defendants are foreclosed at this prefatory point of the litigation from bespeaking of the plaintiff's bad faith and asserting their alleged right in the mark on the basis that the defendants have abandoned the PURE MAID mark in the plaintiff's marketing area is presently without merit. In order to facilitate an understanding of this conclusion, a brief discussion of the abandonment defense is warranted.

To begin with, as employed in common law trademark infringement cases, the term "abandonment" has evolved into a term with a diversified strata of meaning. At one level, an abandonment may transpire as a matter of intent and fact and on another, it can be effectuated as a matter of law by virtue of the occurrence of certain facts. An abandonment of the former variety occurs when a trademark owner forfeits his rights in the mark by consciously transferring or surrendering all claim to the mark by consenting to its use by others. In other words, an abandonment of this nature is tantamount to actual acquiescence. *See* 3 Callman, *Unfair Competition, Trademarks and Monopolies*, § 79.1 (3d Ed. 1969).

This form of abandonment includes both an intent to abandon and an external act by which the intention is carried into effect. *Baglin v. Cusenier*, 221 U.S. 580, 598, 31 S.Ct. 669, 55 L.Ed. 863 (1911); *Gold Seal Associates, Inc. v. Gold Seal Associates*, 56 F.2d 452, 453 (2d Cir. 1932); *Wallace v. Repetti*, 266 F. 307, 308 (2d Cir.), *cert. denied* 254 U.S. 639, 41 S.Ct. 13, 65 L.Ed. 451 (1920). While the mere lapse of time during which use is discontinued is insufficient

to establish abandonment, *Beech-Nut Packing Co., supra,* 273 U.S. at 632, 47 S.Ct. 481 (1927); *Huber Baking Co., supra* at 956; *Field Enterprises Educational Corp., supra* at 386, the extensive and persistent adverse use of a trademark during a long period of time coupled by the failure of a knowing owner to complain, evidences an intention by the owner to abandon the mark, *see Baglin, supra* at 598, 31 S.Ct. 669; *Wallace, supra* at 308–09.

 Generally, the mere adoption of the mark by another without the owner's consent will not entitle the appropriator to the use of the mark in connection with goods of the class to which it had been applied. *Fahey Tobacco Co. v. Senior,* 247 F. 809, 813 (E.D.Pa.1917), *modified,* 252 F. 579 (3d Cir. 1918). If this were not so, the protection afforded a mark would be stripped of any significance whatsoever. Consequently, one who claims rights in a mark by virtue of an abandonment has the burden of proving that an abandonment has transpired. *R.C.W. Supervisor, Inc. v. Cuban Tobacco Co.,* 220 F.Supp. 453, 460 (S.D.N.Y.1963). *See Dawn Donut, supra* at 368.

Even as to the defense of abandonment, however, it appears that in some instances a court must examine the lineage of the mark's use by the second user to be assured that good faith was a characteristic of its nascent period. Thus, it has been held that an abandonment by a first user will perfect the title of a second user if the latter commenced using the mark in good faith before the abandonment. *See McGehee v. O. K. Storage and Transfer Co., Inc.,* 330 F.2d 703 (5th Cir. 1964). Similarly, it has been noted that the right to expand the use of the mark into a new territory is not deemed abandoned where a second user, who has knowledge of the use of the mark by another and who has no reasonable ground to believe that the owner does not intend to extend its use to the new territory, nonetheless exploits the mark in an attempt to arrest the owner's natural development of the mark. *See Sweet Sixteen Co., supra* at 923. Therefore, the rule may be that where one claims title to a mark by abandonment

and the disputed mark was in use at the time of his appropriation, said appropriation must possess the auspices of good faith.

Of further significance in regard to the contention that the defendants abandoned the PURE MAID mark in the plaintiff's marketing area is the Second Circuit's decision in *Dawn Donut Company v. Hart's Food Stores, Inc.,* 267 F.2d 358 (2d Cir. 1959). In that case, the Court was posed with the problem of whether a plaintiff with a federally registered trademark was entitled to enjoin a junior user in view of the fact that the plaintiff had not licensed or otherwise exploited the mark on the retail level in the defendant's market area for nearly thirty years. The Court held that the abandonment principle as codified in 15 U.S.C. § 1127 (1970) only applies when the registrant has failed to use his mark anywhere in the nation. *Dawn Donut, supra* at 363. After holding that there can be no partial geographical abandonment under the Lanham Act, the Court went on to significantly state:

> Even prior to the passage of the Lanham Act, when trademark protection flowed from state law and therefore depended on use within the state, no case, as far as we have been able to ascertain, held that a trademark owner abandoned his rights within only part of a state because of his failure to use the mark in that part of the state. . . . Accordingly, since plaintiff has used its trademark continuously at the retail level, it has not abandoned its federal registration rights even in defendants trading area.

*Id.* But see *Sheila's Shine Products, Inc. v. Sheila Shine, Inc.,* 486 F.2d 114, 124 (5th Cir. 1973). (Partial geographical abandonment entitled a good faith junior user to exploit the mark in that area.) Thus, it could be inferred that this Circuit would not recognize a fractional abandonment if this issue was placed before it for determination. Moreover, since the plaintiff herein has predicated its claim in part on a violation of section 43(a) of the Lanham Act, it would be reasonable and consistent to apply the *Dawn Donut* holding to the instant

case. However, whether the *Dawn Donut* holding does or should apply to the alleged abandonment of a common law mark need not be presently addressed, as from the limited facts before the Court which bear relevance to this issue, the plaintiff has not met its burden of proving that even a territorial abandonment has transpired.

In this case, no testimony was presented as to the defendants' lack of use of the mark in the United States, including that region claimed to be within the exclusive marketing zone of the plaintiff. To the contrary, the affidavit of Joel Freed, Esq., stated that since the time of the defendants' purchase of the subject mark in 1970, Tropicana has consistently used the mark in the United States on both orange juice and orange drink. Specifically, defendants claim to have commenced using the mark in 1970 and to be currently using the mark in Alabama, Michigan, Minnesota, Missouri, North Carolina, Ohio, Oklahoma, Pennsylvania, West Virginia and Wisconsin. Furthermore, the defendants claim that similar use commenced in New York and Connecticut as early as 1976 and in Pennsylvania and Maryland as early as 1977, said states lying within the zone claimed to be plaintiff's exclusive marketing area. Moreover, although Mr. Goldman's affidavit which accompanied the plaintiff's order to show cause stated that to his knowledge the defendants had not exploited the mark in the plaintiff's seven state market area until January of 1978, at the hearing he stated that he knew that the defendants had used PURE MAID when it offered its products for sale to the plaintiff's customers in 1970 under this label.

■ All of these facts when viewed with the fact that the defendant purchased the mark for valuable consideration and used it from the time of purchase to the present indicate an intent antithetical to that of abandonment. Therefore, on the underdeveloped facts germane to this claim which are presently before the Court, it cannot be said for purposes of this preliminary motion that the plaintiff has met its burden of proving that an abandonment of this nature has occurred since neither the intent to abandon nor the external act effectuating this intent has been proven. Moreover, since the plaintiff's initial use of the mark appears to be clothed with the indicia of bad faith and since the nationally known defendants' purchase and corresponding widespread use of the mark may negate a reasonable belief that they did not intend to use the mark in the territories claimed to be in the exclusive realm of the plaintiff, an abandonment cannot, at this point, be said to have transpired. *Cf. Food Center, Inc. v. Food Fair Stores, Inc.*, 356 F.2d 775, 781 (1st Cir. 1966). Further, since the line of demarcation between abandonment and nonabandonment is often at best indistinct, especially at the inception of a lawsuit, such a determination is better left to a trial on the merits.

■ However, such a conclusion only puts to rest the first tier of the problem raised by the plaintiff's claim of abandonment. As correctly noted by the plaintiff, a similar yet distinct defense of abandonment arises when a Trustee in Bankruptcy attempts to assign a trademark without the corresponding transfer of the goodwill which the mark symbolizes. Despite the fact that the term "abandonment" indicates a conscious forfeiture of rights in a mark, in this hybrid form, intent does not necessarily come into play. In such a case, the transferor may possess the genuine intent to maintain the viability of the mark, but if he transfers the mark without the concomitant goodwill, his good intentions will not breathe life back into the devitalized mark. Such an inescapable fate arises from the nature of a trademark. Since a trademark must be appurtenant to some enterprise to which it is related, if the mark and the goodwill are separated by the Trustee, whether purposefully or inadvertently, the goodwill is abandoned and the underlying rights are destroyed. The net result of such a transfer is a transfer in gross which in trademark law is tantamount to an abandonment. *See Reconstruction Finance Corp., supra* at 182; *In re Jaysee Corset Co.*, 201 F. 779, 780 (S.D.N.Y.1911); *S. F.*

*Myers Co. v. Tuttle*, 183 F. 235, 237 (S.D.N. Y.1910).

In the instant case, the plaintiff maintains that JCA's Trustee abandoned the subject mark by distributing PURE MAID caps and labels in a nondiscriminatory, haphazard fashion and without any supervision or control over their subsequent use. Since the Trustee allegedly sold all of the physical assets essential to the preservation of the mark and the business it represented in such a fashion prior to the bankruptcy sale of the mark, plaintiff concludes that an abandonment was effectuated and that the defendants purchased the right to nothing at the sale. Defendants, however, claim that the goodwill was not separated from the mark but was purchased by them with the mark at the sale. In support of this proposition, the defendants point to the document of title evidencing the sale which states that the goodwill was transferred with the mark.

While the mere recitation in a contract that the goodwill has been transferred has been held to be insufficient to withstand a claim of a transfer in gross where the surrounding circumstances indicate that a transfer in gross did in fact occur, *Avon Shoe Co., Inc. v. David Crystal, Inc.*, 171 F.Supp. 293, 306 (S.D.N.Y.1958), aff'd, 279 F.2d 607 (2d Cir. 1960), such a determination does not have to be presently reached. Plaintiff's claim of a transfer in gross is supported solely by hearsay declarations. No one was called to testify to this alleged fact, and no documents were submitted in support thereof. The record is barren of any evidence that the Trustee permitted others to use the mark in any way which would jeopardize this asset of the bankrupt's estate. To the contrary, he entered into an agreement with the defendants in 1968 as to the use of the mark and later sold the mark at a bankruptcy sale in 1970. Such use of the mark speaks of an intent to preserve its vitality rather than sounds of its demise. *See Belden v. Zophar Mills*, 34 F.2d 125, 127 (2d Cir. 1929); *Schock Independent Oil Co. v. Sinclair Refining Co.*, 24 F.2d 286, 58 App.D.C. 21 (1928).

In order to determine the merit of the plaintiff's claim, the facts surrounding the Trustee's managing and disposition of the bankrupt's estate, the transfer of the mark, and the use of the mark after the transfer must be considered. As the facts stand now, the record is completely devoid of even the slightest scintilla of evidence supporting the alleged misuse of the mark or relating to the extent or lack thereof of the supervision and control actually exercised by the Trustee. Accordingly, it would not be edifying to presently pursue this matter further. Since the plaintiff has failed to meet its burden of proving that such an abandonment transpired, this defense does not estop the defendants at this preliminary state in the litigation from asserting their title to the mark by virtue of the bankruptcy sale.

### Plaintiff's Claim of Estoppel

Turning last to the plaintiff's claim that the defendants are foreclosed from opposing the issuance of the requested preliminary injunction by operation of the doctrine of laches, or more appropriately, estoppel, the Court similarly finds this to be presently without merit. While a trademark owner may be estopped from asserting his claim by his failure to voice a timely objection to the use of his mark by another, the mere passage of time alone will not disentitle him from protesting an infringement. *Hanover Star Milling Co. v. Metcalf*, supra, 240 U.S. at 419, 36 S.Ct. 357; *United Drug Co.*, supra, 248 U.S. at 102, 39 S.Ct. 48; *McLean v. Fleming*, 96 U.S. 245, 253, 24 L.Ed. 828 (1878). However, such a delay may preclude the listless party from being granted any right to an accounting of past profits. *McLean, supra*.

In order to find that a claimant's or defendant's interminable inactivity or negligence has swollen to the level of disabling laches or estoppel, his delay must be an inexcusable one that has consequentially prejudiced an innocent user. *See Menendez v. Holt*, 128 U.S. 514, 523, 9 S.Ct. 143, 32 L.Ed. 526 (1888); *Stork Restaurant, Inc. v. Sahati*, 166 F.2d 348, 363 (9th Cir.

1948); *Varsity House, Inc. v. Varsity House, Inc.*, 377 F.Supp. 1386, 1388 (E.D.N.Y.1974). By the mechanics of this precept, equity comes to the aid of an innocent user and grants him refuge from a claimant who has calmly folded his hands and remained silent while the innocent user has exploited and strengthened his mark. *See Dawn Donut, supra* at 363. Although it is often confused with the indicia of abandonment, estoppel differs from abandonment in that the intent of the slumbering claimant is irrelevant. One who is estopped may be merely the hapless victim of his own lethargy. Estoppel, then, is synonymous with apparent or implied acquiescence. *See* 3 Callman, *Unfair Competition, Trademarks and Monopolies*, § 79.1–2 (3d Ed. 1969).

■ The plaintiff herein argues that the defendants' eight year delay in asserting its right to the exclusive use of PURE MAID with knowledge of the plaintiff's use is tantamount to consent as a matter of law by the defendants to the plaintiff's use. Of preliminary note in this regard is that one cannot be guilty of laches until his right ripens into one entitled to protection, for only then can his torpor be deemed inexcusable. *Cf. Dawn Donut, supra* at 364. This is so because

> the adoption of a trademark does not . . . project the right of protection in advance of the extension of the trade, or operate as a claim of territorial rights over areas into which it thereafter may be deemed desirable to extend the trade. . . . [W]herever the trade goes, attended by the use of the mark, the right of the trader to be protected against the sale by others of their wares in the place of his wares will be sustained. *United Drug Co., supra* 248 U.S. at 98, 39 S.Ct. at 51.

Thus, until there exists an actual clash of interests or until the expansion of the owner's mark into the infringer's territory is on the verge of implementation so that the likelihood of public confusion looms large, there is no basis for an infringement suit. *Dawn Donut, supra* at 364. *See Blue Bell, Inc. v. Jaymar-Ruby Inc.*, 497 F.2d 433, 435

(2d Cir. 1974). As has been significantly noted, where expansion of the mark is but a dream in the owner's business scheme rather than a close reality, to estop the owner

> for failing to institute a suit which the courts have held would have been futile, would produce a ludicrous result.

*Aluminum Fabricating Co., supra*, 160 F.Supp. at 46.

Applying this principle to the matter at hand, it could be said that the defendants herein were entitled to refrain and were perhaps constrained from instituting costly litigation in defense of their claim prior to the present. Such reasoning would flow from the lack of any evidence in the record in support of a direct confrontation as, despite the defendants' apparent entry into the plaintiff's market as early as 1970, there does not appear to have been a real clash of interests until recently. If such an approach was followed, the defendants' right to complain has only recently matured to one cognizable of legal protection.

Nevertheless, assuming that the defendants can be said to have contemplated expanding their mark and closing the gap, which may well be the case in light of the defendants' national reputation and product distribution, or assuming that the parties' interests clashed in 1970 or 1976, upon the sparse facts pertinent to this issue presented herein, it cannot be said that the equitable wall of estoppel obstructs the defendants from pursuing their path of counterattack.

■ In order to be sheltered by the equitable bastion provided by the estoppel doctrine, the party seeking its protection must possess a right which is firmly planted in good faith. *See Hanover Star Milling Co., supra*, 240 U.S. at 419, 36 S.Ct. 357; *National Lead Co. v. Wolfe*, 223 F.2d 195, 202 (9th Cir. 1955); *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 293 F.Supp. 892, 917 (S.D.N.Y.1968). The roots of this axiom stretch back to *Saxlehner v. Eisner & Mendelson Co.*, 179 U.S. 19, 21 S.Ct. 7, 45 L.Ed. 60 (1900) wherein the plaintiff's indefensible delay extinguished his exclusive claim to use of the word "Hundyadi". However, the

plaintiff was awarded an injunction against the use of his label and bottle despite his inordinate delay as the defendant's use of them had been marred by bad faith. *Id.* at 29, 21 S.Ct. 7. Accordingly, later tribunals have held that where the infringement is wilful and deliberate and the claimant acts with the knowledge of the other user's rights, the essential elements of estoppel are lacking, and the claimant will not be entitled to injunctive relief. *See McLean, supra*, 96 U.S. at 253, 24 L.Ed. 828; *Baker, supra* at 466 n.4; *National Lead Co., supra* at 202; *Grove Laboratories v. Brewer & Co.*, 103 F.2d 175, 185 (1st Cir. 1939); *Proctor & Gamble Co. v. J.L. Prescott Co.*, 102 F.2d 773, 779–80 (3d Cir. 1939); *My-T-Fine Corp. v. Samuels*, 69 F.2d 76, 77–78 (2d Cir. 1934); *Colgate-Palmolive Co. v. North American Chemical Corp.*, 238 F.Supp. 81, 87 (S.D.N.Y.1964).

█ Applying the mechanics of this rule to the instant case, as has previously been discussed in some depth, the plaintiff's claim herein appears to be tarnished by bad faith. Consequently, it would be manifestly unjust to estop the defendant at this initial phase of the litigation as the doctrine should only be applied to promote fair dealing. In this vein, in a case where the plaintiff, with knowledge of the defendant-second user's employment of its mark in its territory, waited two years before voicing its complaint, Judge Learned Hand significantly noted:

> [W]ere it not for the intent to trade unfairly, we might hesitate, but advantages built upon a deliberate plagerized make-up do not seem to us to give the borrower any standing to complain that his vested interest will be disturbed.

*My-T-Fine Corp., supra* at 78. *See Masterpiece of Pennsylvania, Inc. v. Consolidated Novelty Co.*, 368 F.Supp. 550, 552 (S.D.N.Y. 1973). Indeed, this statement bears relevance to the Court's position in the instant matter. The ultimate resolution of whether the defendants' languor unjustly lulled the plaintiff into the false security of assuming that the defendants' silence manifested their consent to the plaintiff's use of the subject mark must await the unfolding of further facts during the progression of this action.

## CONCLUSION

After examining all of the facts which were exposed to the Court for consideration, two alternatives faced this Court: to enjoin or not to enjoin the defendant. Neither solution was blessed with clarity or simplicity. In denying the requested preliminary injunction, the Court is aware of the unfortunate effect that this decision may have on the casual, unwary consumer. Indeed, such a denial is tantamount to holding that both parties are free to offer their products for sale in the same marketplace. *Cf. Food Center, Inc. v. Food Fair Stores, Inc.*, 356 F.2d 775, 783 (1st Cir. 1966). Needless to say, this is not a comfortable posture for the Court to assume as the fixed design of a trademark, being a distinguishing token, is that of a source of identification, not one of confusion. *W. E. Bassett Co. v. Revlon, Inc.*, 354 F.2d 868, 871 (2d Cir. 1966). However, the Court rests assured that, despite the additives contained in the defendants' product, there is no danger of physical harm to the public presented by the continued sale of the defendants' frozen concentrate as was the case in *Syntex Laboratories, Inc. v. Norwich Pharmacal Co.*, 437 F.2d 566, 568–69 (2d Cir. 1971).

Through an almost magical interplay of facts and parties, this Court is left in the same position and is confronted by the same public interest dilemma as a Court which recognizes that a plaintiff's laches forestalls the recognition of his trademark rights. Yet to allow the possible perpetration of a continuing wrong and the curtailment of the defendants' expansion when, as here, the facts cast a significant doubt on the plaintiff's good faith would be simply unfair. The bad faith of a claimant is clearly a valid concern in the decision of whether to grant the requested relief. *See King Research, Inc. v. Shulton Inc.*, 324 F.Supp. 631, 636 (S.D.N.Y.1971). Indeed, at this threshold point of this litigation, the Court has been left with but a Hobson's choice.

When trademarks clash, there is a patent need to examine the cornerstones of the conflicting claims and then balance the respective interests with an eye towards equity. Therefore, a Court must search for a result that will subserve rather than defeat substantial justice. Indeed, the scope of vision in this respect is substantially narrowed in the preliminary litigative stage by the rather thin layer of facts upon which such a determination must rest. Yet, if upon examining these facts, a Court is left with a strong doubt that the plaintiff has met its burden of proof for the issuance of a preliminary injunction, said relief should not issue. See *Thrift Air Club, Inc. v. Eastern Airlines*, 272 F.Supp. 307, 308 (S.D.N.Y. 1967).

In the matter at hand, with this sparse layer of facts in mind, the Court finds that the plaintiff has failed to show a probable success on the merits coupled with possible irreparable injury or that there exists sufficiently serious questions going to the merits as to make them fair ground for litigation together with the balance of hardships tipping decidedly in its favor. In view of the shadow of bad faith which looms over the plaintiff's claim, it could be said that the plaintiff took

> a calculated risk that [the defendants] would not later re-enter the New York market and compete. The aid of a court of equity should not be invoked on behalf of one who lost such a gamble.

*Aluminum Fabricating Co., supra*, 160 F.Supp. at 46. Similarly, a bad faith user cannot implore a court to forestall potential economic injury and confusion as

> whatever confusion may have arisen from conflicting use of the mark is attributable to [such a] petitioner's entry into the field with notice of the situation.

*United Drug Co., supra*, 248 U.S. at 103–04, 39 S.Ct. at 53. As Learned Hand noted, such a conclusion is necessary as "in cases of the piracy of a mark . . . the court imposes the chance of loss upon those who deliberately steal the name." *International Film Service Co., Inc. v. Associated Producers, Inc.*, 273 F. 585, 588 (S.D.N.Y.1921).

Although there may exist complicated legal issues to be untangled herein, and although it may turn out that the plaintiff has been unjustly forced to suffer by virtue of the denial of the requested relief, the lurking element of the plaintiff's bad faith undermines the strength of its role in the factors of the preliminary injunction test and causes the balancing of the hardships, the probability of success and the irreparable injury factors to weigh in favor of the defendant. Moreover, since the purpose of a preliminary injunction is to preserve the status quo and the instant facts indicate that the parties' rights may have co-existed since 1976, in denying the requested relief and permitting the defendants to continue to market their frozen concentrate product, the status quo is being maintained.

The scope of an equitable remedy should not exceed the underlying right. Here, since the boundaries of the plaintiff's right are presently beclouded by bad faith, the clearly defined confines of a preliminary injunction are inappropriate. However, in denying this requested relief, it must be kept in mind that the denial of a preliminary injunction does not constitute an ultimate determination on the merits of the controversy. *Jacobson & Co., Inc. v. Armstrong Cork Co.*, 416 F.Supp. 564, 570 (S.D.N.Y.1976), *aff'd*, 548 F.2d 438 (2d Cir. 1977). Accordingly, the plaintiff will have the opportunity to put its claims to the test of an infringement suit and both the parties and the Court will have the benefit of discovery and further evidence in seeing that this suit is brought to a just determination.