```
THIS OPINION IS A
PRECEDENT OF THE TTAB
```

Mailed: 3/15/07

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

Jansen Enterprises, Inc.
v.
Israel Rind and Stuart Stone

_____

Cancellation No. 92042871

_____

Richard J. Polley, Kristin L. Cleveland and Sheree Lynn
Rybak of Klarquist Sparkman for Jansen Enterprises, Inc.

Otto O. Lee and Erin Williams of Intellectual Property Law
Group for Israel Rind and Stuart Stone.

_____

Before Seeherman, Quinn and Bucher, Administrative Trademark
Judges.

Opinion by Quinn, Administrative Trademark Judge:

Jansen Enterprises, Inc. ("petitioner") has petitioned

to cancel the registration owned by Israel Rind and Stuart

Stone ("respondent"[1]) for the mark shown below

---

[1] Although two individuals are the joint owners of the
registration, we will refer to them in the singular.



for "restaurant services featuring bagels as a main entrée" in International Class 42.[2]

As grounds for cancellation, petitioner alleges that respondent's mark, as used in connection with respondent's services, so resembles petitioner's previously used and registered IZZY'S marks for restaurant services, restaurant franchising services, and pizza as to be likely to cause confusion. The petition was filed before the registration was five years old and, therefore, the ground of likelihood of confusion was available to petitioner.

---

[2] Registration No. 2221192, issued February 2, 1999; Section 8 affidavit filed and accepted. The lining is a feature of the mark and does not indicate color. The registration includes the following disclaimer: "No claim is made to the exclusive right to use 'The Authentic Flavor Brooklyn Bagels Kosher' and the design of the Star of David apart from the mark as shown."

Cancellation No. 92042871

Respondent, in his answer, denied the salient allegations in the petition for cancellation.  Respondent also set forth detailed statements that amplify his denial of likelihood of confusion.  In addition, respondent set forth the affirmative defenses of laches, acquiescence and estoppel.[3]

## The Record

The record consists of the pleadings; the file of the registration sought to be cancelled; affidavit testimony, with related exhibits, taken by each party pursuant to agreement; certified copies of petitioner's pleaded registrations, copies of official records, including papers from prior Board proceedings, a copy of one third-party registration, and respondent's responses to certain of petitioner's discovery requests, all introduced by way of petitioner's notices of reliance; and petitioner's responses to certain of respondent's discovery requests, and several other items, including photographs, all made of record by respondent's notice of reliance.[4]  Both parties filed briefs

---

[3] The answer also included a proposed counterclaim to partially cancel petitioner's pleaded registrations by further limiting the geographic scope thereof.  The Board noted, in an order dated March 30, 2004, that geographic limitations are considered and determined by the Board only within the context of a concurrent use registration proceeding.  The Board informed the parties that, in view thereof, the counterclaim would not be considered.
[4] Respondent's introduction of a certified copy of his registration sought to be cancelled herein is superfluous.  See Trademark Rule 2.122(b); and TBMP § 704.03(a) (2d ed. rev. 2004).  Further, several of the items listed in respondent's notice of reliance are not proper subject matter for introduction by way of

3

on the case.

## Issues

There are three issues for us to consider in this proceeding:

1) priority and likelihood of confusion;

2) the equitable defense of laches; and, if laches is applicable,

3) whether confusion is inevitable.

## The Parties

Petitioner exclusively licenses its IZZY'S marks to Izzy's Franchise Systems, Inc., which in turn sublicenses the marks to restaurant operators who use the marks in the area comprising the states west of the Mississippi River.[5] Currently, there are twenty-four IZZY'S licensed restaurants located in the states of Oregon and Washington. Petitioner has received inquiries from prospective licensees requesting franchise information for operating restaurants in several other states, including California.[6] Petitioner's restaurants are casual dining establishments offering take

---

notice of reliance. Nevertheless, petitioner has treated the evidence as if properly made of record. Accordingly, we deem petitioner to have waived any objection thereto, and we have considered all of the evidence listed in respondent's notice of reliance.

[5] As noted infra, petitioner owns concurrent use registrations which entitle it to exclusive use of the marks west of the Mississippi River.

[6] According to Fred Jansen, petitioner's chief executive officer, "Covalt Enterprises, Inc. [petitioner's predecessor in interest] has previously licensed its IZZY'S trademarks to franchisees who operated IZZY'S restaurants in the State of California."

out and dine in options.  Over the past fifteen years, annual sales at petitioner's IZZY'S restaurants have been in the $25-$35 million range.  During the same time period, petitioner spent $1.1-$1.6 million annually to advertise its IZZY'S restaurants.

Israel Rind, one of the named respondents, testified that he has been known by the nickname "Izzy" ever since he arrived in this country in 1959, and that, in November 1996, he opened the first IZZY'S BROOKLYN BAGELS restaurant in Palo Alto, California.  A second restaurant under the same mark opened in January 2003 in San Francisco, California. Respondent's restaurants are deli-bakeries without table service; the menu focuses on bagels, sandwiches, soups, pastries, and desserts.  Unlike petitioner, respondent does not offer any type of salad bar or buffet.  Respondent's restaurants began to sell pizza in 2003.  All of the products sold in respondent's restaurants, including pizza, are prepared "according to very strict kosher standards for observant Jewish people."  For the past 8 years, respondent's annual sales totaled approximately $1 million and, during that same time period, total advertising expenditures were around $100,000.  Pizza accounts for approximately 10 per cent of respondent's sales.

## Standing

Petitioner has established its standing to seek cancellation of respondent's registration. In particular, petitioner has properly made its pleaded registrations of record, and petitioner further has shown that it is not a mere intermeddler. See Cunningham v. Laser Golf Corp., 222 F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000); and Lipton Industries, Inc. v. Ralston Purina Co., 670 F.2d 1024, 213 USPQ 185 (CCPA 1982).

## Priority

The record shows that petitioner, through its predecessor in interest, Covalt Enterprises, Inc., began use of its IZZY'S marks in connection with restaurant services and pizza in 1979, that is, many years prior to respondent's first use of his mark in 1996. Thus, petitioner has established its priority of use, and respondent does not contend otherwise.

## Likelihood of Confusion

Our determination under Section 2(d) is based on an analysis of all of the facts in evidence that are relevant to the factors bearing on the likelihood of confusion issue. In re E. I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). Petitioner must establish that there is a likelihood of confusion by a preponderance of the

evidence.  The relevant du Pont factors in the proceeding now before us are discussed below.

Petitioner owns the following concurrent use registrations:



for "restaurant services;"[7] IZZY'S for "pizza;"[8] IZZY'S for "franchising services, namely, offering technical assistance in establishment and/or operation of restaurants;"[9] and IZZY'S PIZZA RESTAURANT ("PIZZA RESTAURANT" disclaimed) for "restaurant services."[10]

Because respondent's registration is most similar to petitioner's registration for IZZY'S in stylized form for restaurant services, we have focused our attention on this

---

[7] Concurrent Use Registration No. 1220370, issued December 14, 1982; renewed.  The registration is "limited to the area comprising the states west of the Mississippi River."
[8] Concurrent Use Registration No. 1821543, issued February 15, 1994; renewed.  The registration is "limited to the area comprising the states west of the Mississippi River."
[9] Registration No. 1952081, issued January 30, 1996; Section 8 affidavit accepted, Section 15 affidavit acknowledged.  This registration does not include any geographical limitations.
[10] Concurrent Use Registration No. 2046855, issued March 25, 1997; Section 8 affidavit accepted, Section 15 affidavit acknowledged. The registration is limited to "the entire United States except for the area comprising the states east of the Mississippi River."

registration in our likelihood of confusion analysis.

By way of background, petitioner's concurrent use registration rights were adjudicated in Concurrent Use No. 792. The junior user, Izzy's Inc. (not a party in this cancellation proceeding), identified petitioner's predecessor-in-interest as an excepted registrant/applicant with rights for the area comprising all the states west of the Mississippi River. Petitioner entered into an agreement with this third party; the parties filed the agreement, along with a joint statement of facts, with the Board. On the basis of these papers, the parties requested that concurrent use registrations issue with the territorial restrictions agreed to by the parties, and that petitioner's Registration No. 1220370 be restricted accordingly. The Board was persuaded by the evidence and, in an order dated May 6, 1993, Izzy's Inc. was granted registrations for its various IZZY'S marks for the area comprising the states east of the Mississippi River; and petitioner was given registrations for the states west of the Mississippi River.

## The Goods and/or Services

With respect to the goods and/or services, the nature and scope of a party's goods and/or services must be determined on the basis of the goods and/or services recited in the application and/or registration. See, e.g., Hewlett-Packard Co. v. Packard Press Inc., 281 F.3d 1261, 62 USPQ2d

8

1001 (Fed. Cir. 2002); Octocom Systems Inc. v. Houston Computer Services Inc., 918 F.2d 937, 16 USPQ2d 1783 (Fed. Cir. 1990); and Canadian Imperial Bank v. Wells Fargo Bank, 811 F.2d 1490, 1 USPQ2d 1813 (Fed. Cir. 1987). It is well established that the goods and/or services of the parties need not be similar or competitive, or even that they are offered through the same channels of trade, to support a holding of likelihood of confusion. It is sufficient that the respective goods and/or services of the parties are related in some manner, and/or that the conditions and activities surrounding the marketing of the goods and/or services are such that they would or could be encountered by the same persons under circumstances that could, because of the similarity of the marks, give rise to the mistaken belief that they originate from the same source. See Hilson Research, Inc. v. Society for Human Resource Management, 27 USPQ2d 1423 (TTAB 1993); and In re International Telephone & Telegraph Corp., 197 USPQ 910, 911 (TTAB 1978). The issue, of course, is not whether purchasers would confuse the goods and/or services, but rather whether there is a likelihood of confusion as to the source of the goods and/or services. In re Rexel Inc., 223 USPQ 830 (TTAB 1984).

Both parties render restaurant services under their marks. As respondent points out, his restaurant services,

as described in his registration, focus on "featuring bagels as a main entrée."

In comparing petitioner's "restaurant services" to respondent's "restaurant services featuring bagels as a main entrée," it must be noted that petitioner's recitation of services does not include any limitations. Thus, we must presume that petitioner's "restaurant services" encompass all types of restaurants, and that the restaurant services are rendered to all classes of purchasers. In re Smith and Mahaffey, 31 USPQ2d 1531 (TTAB 1994); and In re Elbaum, 211 USPQ 639 (TTAB 1981). Accordingly, petitioner's restaurant services are presumed to encompass restaurants that feature bagels as a main entrée.

In view of the above, in our analysis we must treat the parties' restaurant services as being legally identical. Accordingly, we presume that the services are rendered to the same classes of purchasers, and that these would include ordinary purchasers.[11] Genesco Inc. v. Martz, 66 USPQ2d 1260 (TTAB 2003). Further, it would appear, based on the recitation of services and evidence of record, that the parties' restaurants are relatively inexpensive, and would

---

[11] Respondent claims that his patrons "purchase food with a high level of care and sophistication, which is necessary to follow a kosher diet." While this statement may be true, the recitation of services that controls our analysis does not limit the customers for respondent's services to those adhering to kosher dietary laws. Further, there is nothing in petitioner's

10

registration which would prevent it from also offering kosher
food.

be the subject of impulse visits.

Further, the fact that respondent sells only kosher foods is of no moment. See In re Bercut-Vandervoort & Co., 229 USPQ 763, 764 (TTAB 1986) [a registrant cannot restrict the scope of its goods/services listed in the registration by extrinsic evidence or argument].

The legal identity of the restaurant services weighs heavily in petitioner's favor. In addition to this second du Pont factor, the factors of identical trade channels, classes of purchasers, and the conditions of sale all weigh in favor of a finding of likelihood of confusion.

## The Marks

In considering the marks, we initially note that when marks are used in connection with identical goods and/or services, "the degree of similarity [between the marks] necessary to support a conclusion of likely confusion declines." Century 21 Real Estate Corp. v. Century Life of America, 970 F.2d 874, 23 USPQ2d 1698, 1700 (Fed. Cir. 1992).

With respect to the involved marks, we examine the similarities and dissimilarities of the marks in their appearance, sound, meaning, and commercial impression. Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772, 396 F.3d 1369, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005).

12

The test, under the first du Pont factor, is not whether the marks can be distinguished when subjected to a side-by-side comparison, but rather whether the marks are sufficiently similar in terms of their overall commercial impression that confusion as to the source of the goods and/or services offered under the respective marks is likely to result. The focus is on the recollection of the average purchaser, who normally retains a general rather than a specific impression of trademarks. See Sealed Air Corp. v. Scott Paper Co., 190 USPQ 106 (TTAB 1975). Furthermore, although the marks at issue must be compared in their entireties, it is well settled that one feature of a mark may be more significant than another, and it is not improper to give more weight to this dominant feature in determining the commercial impression created by the mark. In re National Data Corp., 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985) ["[T]here is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties. Indeed, this type of analysis appears to be unavoidable."].

In considering respondent's mark, there is no question that a particular design feature of the mark, a boy carrying a basket full of bagels, is a prominent feature. We also

13

recognize that the mark includes a stylized reproduction of a portion of the Brooklyn Bridge, and additional design features. Notwithstanding the prominence of the design features, we find that the literal portion of respondent's mark dominates respondent's mark and that, in turn, the literal portion is dominated by the arbitrary name "IZZY'S." See Giant Food, Inc. v. Nation's Foodservice, Inc., 710 F.2d 1565, 218 USPQ 390 (Fed. Cir. 1983); and Burger Chef Systems, Inc. v. Sandwich Chef, Inc., 608 F.2d 875, 203 USPQ 733 (CCPA 1979). The name "IZZY'S" clearly is the most distinctive feature of the literal portion of respondent's mark and is the portion most likely to be remembered by consumers and used when referring to respondent's restaurant services. In particular, the name "IZZY'S" is in larger font size than the other words, and is placed toward the top of the literal portion.[12] As earlier noted, the words "The Authentic Flavor Brooklyn Bagels Kosher" and the Star of David design are disclaimed in view of their generic or descriptive nature. These disclaimed features, not to mention the boy design and the Brooklyn Bridge design, are unlikely to be used in calling for the services. Accordingly, the name "IZZY'S" is the dominant element of respondent's mark and is therefore accorded greater weight

---

[12] We note petitioner's claim, supported by the record, that respondent now uses the name "IZZY'S" in an even more prominent fashion.

14

in determining the likelihood of confusion. Ceccato v. Manifattura Lane Gaetano Marzotto & Figli S.p.A., 32 USPQ2d 1192 (TTAB 1994); and In re Appetito Provisions Co., 3 USPQ2d 1553 (TTAB 1987). Although we acknowledge the Federal Circuit's caution that there is no general rule as to whether a word or a design dominates in any particular mark, it is highly unlikely that consumers will refer to respondent's restaurant as anything other than "IZZY'S." Given the easily pronounced and distinctive name "IZZY'S," and the common knowledge that restaurants often are identified by a person's name, consumers are more likely to remember "IZZY'S" than the other elements of the mark.

Petitioner's mark that is registered for restaurant services is IZZY'S in stylized form.[13] Thus, the name "IZZY'S" in the parties' marks is identical in sound and meaning (as a person's name or nickname). Nor does the stylization serve to distinguish the appearance of the marks in any meaningful manner.

We recognize that the additional wording and design elements in respondent's mark create differences in appearance from petitioner's mark IZZY'S. Notwithstanding the differences in appearance, however, the overall

---

[13] Petitioner also has a registration for IZZY'S PIZZA RESTAURANT for restaurant services but, as noted previously, we are concentrating our analysis on the question of likelihood of confusion between respondent's registered mark and petitioner's stylized mark IZZY'S for restaurant services.

commercial impressions of the marks, when used in connection with restaurant services, is that the restaurant is owned by someone named "Izzy."  The extra wording and design features in respondent's mark merely give additional information about the nature of respondent's restaurant.

We find that any difference between the marks in appearance is outweighed by the similarities in sound, meaning and overall commercial impression.  In sum, when the marks are considered in their entireties, the marks are confusingly similar.

The similarity between the marks weighs in petitioner's favor.

### Third-Party Use

In his brief, respondent asserts that "Izzy" is "a first name common to thousands of people," and that "hundreds, if not thousands of unregistered common law marks containing 'IZZY,' related to food or restaurants, exist nationwide."  (Brief, p. 17).  Respondent also states in his brief that there are five third-party registrations of "IZZY'S" marks in the restaurant field, and gives three examples of third-party uses of such marks.  However, the only evidence respondent submitted in support of his contention that there are a large number of third-party uses of IZZY'S for food and restaurants is exhibit no. 16, which respondent described as a "spreadsheet document showing 38

16

IZZY businesses in the states of California, Nevada, Oregon and Arizona."

Factual statements made in a party's brief on the case can be given no consideration unless they are supported by evidence properly introduced at trial. TBMP § 704.06(b) (2d ed. rev. 2004). Respondent failed to properly introduce any third-party registrations for "IZZY'S" marks. That is to say, respondent's mere reference in his brief to the registrations did not suffice to make them of record. In order to introduce the third-party registrations, respondent should have submitted copies of the registrations. TBMP § 704.07 (2d ed. rev. 2004). In any event, with respect to third-party registrations, such evidence, even if properly of record, is of little probative value in deciding likelihood of confusion because they do not prove that the marks are in use or that the public is familiar with them. The Conde Naste Publications, Inc. v. Miss Quality, Inc., 507 F.2d 1404, 184 USPQ 422, 424-25 (CCPA 1975).

Insofar as the third-party uses are concerned, there is neither testimony nor other evidence corroborating these uses. The underlying foundation of the spreadsheet generated by respondent is completely unknown. In addition, of course, there is no way to know what effect, if any, these purported uses of "IZZY'S" marks may have had in the

minds of consumers.  Carl Karcher Enterprises Inc. v. Star Restaurants Corp., 35 USPQ2d 1125, 1131 (TTAB 1995).

In view of the above, this factor is neutral.

### Fame

Petitioner claims that its IZZY'S marks are famous due to a long period of continuous use and significant advertising expenditures.  More specifically, petitioner refers to its use of IZZY'S for over twenty-five years; annual sales in the $25-$35 million range over the past fifteen years; and annual advertising expenditures during the same period in the $1.1-$1.6 million range.

We readily acknowledge that petitioner has enjoyed success with its restaurants.  Given this success, and the distinctive nature of the term "IZZY'S," we find petitioner's mark to be strong.  We also find, however, that the evidence falls short of establishing fame as contemplated by the case law.  Cf. See Bose Corp. v. QSC Audio Products Inc., 293 F.3d 1367, 63 USPQ2d 1303 (Fed. Cir. 2002); Recot Inc. v. Becton, 214 F.3d 1322, 54 USPQ2d 1894 (Fed. Cir. 2000); and Kenner Parker Toys, Inc. v. Rose Art Industries, Inc., 963 F.2d 350, 22 USPQ2d 1453 (Fed. Cir. 1992).

In sum, the fame factor is neutral.  The distinctiveness of petitioner's "IZZY'S" marks, however, weighs in petitioner's favor.

## Actual Confusion

In finding a likelihood of confusion, we recognize that the record reflects the absence of any actual confusion despite a decade of contemporaneous use of the marks. This may be explained by the fact that, while the parties operate in contiguous states, the parties' restaurants are not located in the same geographical area. Thus, it may be that the same consumers have not been exposed to both restaurants. See Carl Karcher Enterprises Inc. v. Star Restaurants Corp., 35 USPQ2d at 1133.

In any event, the test for our purposes under Section 2(d) is likelihood of confusion, not actual confusion. Giant Food, Inc. v. Nation's Foodservice, Inc., 218 USPQ at 396.

Accordingly, this factor is neutral.

## Conclusion: Likelihood of Confusion

In summary, we find that the du Pont factors, on balance, weigh in favor of petitioner and a finding that there is a likelihood of confusion between the parties' marks.

## Equitable Defense: Laches

By statute, laches is available as a defense in cancellation proceedings. 15 U.S.C. § 1069. In order to prevail on his affirmative defense of laches, respondent is required "to establish that there was undue or unreasonable

delay [by petitioner] in asserting its rights, and prejudice to [respondent] resulting from the delay." Bridgestone/Firestone Research Inc. v. Automobile Club de l'Ouest de la France, 245 F.3d 1359, 58 USPQ2d 1460, 1462-63 (Fed. Cir. 2001). See Lincoln Logs Ltd. v. Lincoln Pre-Cut Log Homes Inc., 971 F.2d 732, 23 USPQ2d 1701 (Fed. Cir. 1992). The laches defense, if successful, will serve as a bar against a petition for cancellation grounded on a likelihood of confusion unless confusion is inevitable.

Respondent claims that petitioner had actual notice of respondent's registration since early 2000, even threatening to petition to cancel the registration at that time. Respondent contends that petitioner unjustifiably delayed in filing the instant petition in January 2004, just six days before the five-year anniversary date of the registration, and that, therefore, petitioner is guilty of laches. Petitioner's delay, according to respondent, resulted in prejudice to respondent because during this time of delay, respondent continued to invest in and expand his business. According to Mr. Rind, respondent opened a second restaurant in January 2003; respondent's annual sales for his two restaurants during the past eight years were about $1 million; and during this same time period, annual advertising expenditures were approximately $100,000. Respondent further argues that petitioner's excuse of being

busy in its pursuit of other cancellation proceedings falls short given that, between the time of issuance of respondent's registration and the filing of the present petition for cancellation, petitioner filed only one other petition. Respondent concludes that petitioner should have addressed its concerns far earlier, but rather chose to sit on its claimed rights while respondent continued to invest in his business, including the opening of a second location.

Petitioner asserts that it has never acquiesced to respondent's use or registration, and that any delay in bringing this cancellation proceeding is reasonable and, in any event, excusable. According to petitioner, about three years passed between the last correspondence between the parties and the actual filing of the petition to cancel and, in the interim, petitioner was busy pursuing other cancellation proceedings. The pursuit of these other proceedings, petitioner asserts, diverted its immediate attention from respondent's actions. Petitioner further contends that Mr. Jansen thought respondent was operating a bagel shop in New York and, because petitioner's trademark rights are limited to states west of the Mississippi River, petitioner was not opposed to respondent's use of his registered mark in connection with a bagel shop in New York. Petitioner also specifically points to the addition of pizza as a menu item at respondent's restaurants in September

21

2003, and a change to respondent's mark whereby "IZZY'S" is much more prominent, which occurred just four months prior to petitioner's filing the present petition for cancellation.

Mr. Jansen, petitioner's chief executive officer, testified as follows:

> In September 2003, I became aware that the Izzy's Brooklyn Bagels restaurant appeared no longer to be merely a bagel shop, but instead also was advertising pizza on its web site. In addition, the Izzy's Brooklyn Bagels website did not show the mark IZZY'S BROOKLYN BAGELS THE AUTHENTIC FLAVOR KOSHER (AND DESIGN) as it was registered. The term "Izzy's" was centered and in a large font, not diminutive as shown in the trademark registration. Because pizza is a large part of the business of [petitioner] and is widely associated with the IZZY'S marks of [petitioner], the change in the menu of the Izzy's Brooklyn Bagels restaurant and web site made it apparent that customer confusion would inevitably result from the simultaneous use of the IZZY'S marks owned by [the parties]. Promptly after learning of the changes in the menu of the Izzy's Brooklyn Bagels restaurant and web site, [petitioner] filed this Cancellation Proceeding on January 27, 2004.
>
> Other factors affected the timing of the filing of this Cancellation Proceeding. [Petitioner] has enforced its trademark rights against other parties as the need has arisen. For example, [petitioner] filed a Petition to cancel Trademark Registration No. 1,968,227 for the mark NEW YORK DIZZY IZZY'S BAGELS on April 13, 2001 (Cancellation No. 92031947) and filed a Petition to cancel Trademark Registration No. 2,283,576 for the mark IZZY BAR on September 17, 2004

22

(Cancellation No. 92043710). The
expense and distraction of ongoing
trademark enforcement has been a factor
in the timing of the present and other
Cancellation Proceedings instituted by
[petitioner].

In or about early 2000, I spoke with Mr.
Israel Rind. I do not recall Mr. Rind
telling me that his bagel shop was in
California. Mr. Rind told me he was
operating a bagel shop called Izzy's
Brooklyn Bagels. I believed during and
after the conversation that he was
operating a bagel shop in New York.
Because the federal trademark
registrations of [petitioner] are
limited to the area comprising the
states west of the Mississippi River due
to Concurrent Use Proceeding No. 792,
[petitioner] was not opposed to Mr.
Rind's use of the Izzy's name in
association with a bagel shop in New
York.

Prior to initiating the present
Cancellation Proceeding, [petitioner]
notified Registrants that their
registered mark IZZY'S BROOKLYN BAGELS
THE AUTHENTIC FLAVOR KOSHER (AND DESIGN)
was confusingly similar to the IZZY'S
marks owned at that time by
[petitioner's predecessor in interest]
by letters sent to the Registrants'
attorney on June 27, 2000 and October 9,
2000.

I do not recall Mr. Rind ever offering
to consent to registration of any IZZY'S
mark used by [petitioner].

Also of record are the two letters sent from petitioner's

counsel to respondent's counsel in 2000. The first letter

is dated June 27, 2000; in this letter, petitioner informed

respondent that it owned three federal trademark

registrations (the same ones pleaded herein), setting forth

23

the information for each registration accompanied by copies of the registration certificates. Petitioner also disclosed that it had applied to register the mark IZZY'S PIZZA BAR CLASSIC BUFFET, but that the application was rejected under Section 2(d) based on respondent's registration sought to be cancelled herein. Petitioner's counsel went on to write:

> Because [petitioner] wishes to be free to register new "IZZY'S" trademarks as they are developed and because confusion may someday result if [petitioner and respondent] establish restaurants in the same market territory, [petitioner] is compelled to take action regarding your client's registration of the mark IZZY'S BROOKLYN BAGELS THE AUTHENTIC FLAVOR KOSHER.
>
> It appears that the registration of [respondent's mark] was granted in error, because [petitioner] previously established exclusive rights to use "IZZY'S" marks for restaurant services in states west of the Mississippi river. Accordingly, [petitioner] will petition to cancel the registration of [respondent's mark] if necessary.
>
> In hopes of resolving the matter without resorting to a formal administrative adjudication, [petitioner] requests that [respondent] voluntarily cancel its registration. This would minimize expense for everyone and would leave the record free of a decision adverse to [respondent]. Enclosed is a form that [respondent] could submit to effect the cancellation.
>
> Please talk with your clients and call if you wish to discuss this matter further. If we receive no response by July 14, 2000, [petitioner] will initiate a cancellation proceeding.

The next correspondence in the record is another letter from petitioner's counsel to respondent's counsel, this one dated October 9, 2000.  The letter reads, in pertinent part, as follows:

> Enclosed is a Petition to Cancel [respondent's registration] owned by [respondent].
>
> Our clients cannot accept your proposal to geographically divide territories such that your clients would have exclusive rights in northern California.  This is unacceptable because northern California is on the border of our clients' current market territory and is a logical area for expansion.  And in any event, there is no incentive for our clients to enter such an agreement because [petitioner's] incontestable federal registrations already provide the right for our clients to use IZZY'S marks throughout the western United States.
>
> Thus, unless you can propose a more workable solution, our clients must petition to cancel the [respondent's] registration.
>
> It is still our hope that this matter can be resolved without resorting to a formal administrative adjudication. For this reason we again suggest that your clients voluntarily cancel their registration.  This would minimize expense for everyone and would leave the record free of a decision adverse to your clients.
>
> Please call if you wish to discuss this matter further.  If we do not hear from you by **November 1, 2000**, a cancellation proceeding will be initiated.  (emphasis in original).

Respondent responded to petitioner's latter correspondence with a letter from his counsel to petitioner's counsel.  In the letter, dated October 31, 2000, counsel specifically indicated that respondent declined to voluntarily cancel his registration.  Respondent's counsel also discussed various reasons why there is no likelihood of confusion between the parties' marks, including differences between the marks, third-party uses of "Izzy's" marks and the absence of any actual confusion.  The letter included the following proposal:

> I understand from your letter that previously a suggestion was made to geographically divide territories, and that the suggestion was rejected.  I am authorized to propose a consent to use agreement which would contain no such geographic division, so that your client could (a) proceed to register its intended mark and (b) be unrestricted geographically in its use of its marks, provided our client has the same benefit.  Our client would further agree not to seek registration of any further marks containing "Izzy's" for goods or services outside the realm of bagels and kosher items and restaurants serving the same.  Your client would agree not to seek registration of marks specifically including goods or services referring to bagels or kosher items.  The agreement would also provide that we would cooperate with your attempted registration, and that each would agree that the other's existing registered marks and the intended mark are not likely to cause confusion with each other.
>
> I would be pleased to discuss this further with you if there is interest in

26

>       resolving this matter by such a
>       compromise arrangement.

The record does not show any additional contact between the parties until the filing of the petition for cancellation, more than three years later, in January 2004.

Mr. Rind testified, in relevant part, as follows:

>       In or about early 2000, I spoke with Mr.
>       Fred Jansen by telephone conference,
>       who, to the best of my knowledge, is the
>       majority shareholder and CEO of Jansen
>       Enterprises, Inc., about my use of my
>       trademark IZZY'S BROOKLYN BAGELS THE
>       AUTHENTIC FLAVOR KOSHER (AND DESIGN),
>       and he did not indicate in this phone
>       conversation that he was opposed to my
>       use of my mark.
>
>       Since the time of my phone conversation
>       with Mr. Jansen in or about early 2000,
>       I did not again have any contact from
>       him or Jansen Enterprises, Inc. until
>       the present cancellation proceeding was
>       filed on January 27, 2004.
>
>       My trademark, IZZY'S BROOKLYN BAGELS THE
>       AUTHENTIC FLAVOR KOSHER (AND DESIGN),
>       had been registered on the federal
>       register for almost five years prior to
>       the filing of this present cancellation
>       proceeding filed on January 27, 2004,
>       without objection from any other party.
>
>       For at least four to five years, I have,
>       in good faith, because of Mr. Jansen's
>       silence after our telephone conference,
>       continued to use my mark IZZY'S BROOKLYN
>       BAGELS THE AUTHENTIC FLAVOR KOSHER (AND
>       DESIGN) under the belief that Mr. Jansen
>       was not opposed to my use of my mark.
>
>       Prior to the filing of this cancellation
>       proceeding, and after the telephone
>       conference with Mr. Jansen, I have never
>       received any notice from Jansen
>       Enterprises, Inc. or from Mr. Jansen

27

himself, that my use of IZZY'S BROOKLYN
BAGELS THE AUTHENTIC FLAVOR KOSHER (AND
DESIGN) was infringing on Jansen
Enterprises, Inc.'s various federally
registered trademarks.

Despite having (1) used my trademark for
more than eight years, (2) registered my
trademark over six years ago, and (3)
personally discussed with Mr. Jansen
about my use of my mark IZZY'S BROOKLYN
BAGELS THE AUTHENTIC FLAVOR KOSHER (AND
DESIGN) in or about early 2000, and
after my telephone conference with Mr.
Jansen, I have never received any notice
from either Jansen Enterprises, Inc. or
from Mr. Jansen himself, that my use of
IZZY'S BROOKLYN BAGELS THE AUTHENTIC
FLAVOR KOSHER (AND DESIGN) was damaging
or confusingly similar to their
trademarks.

Mr. Rind, in noting that petitioner's then-pending
application serial no. 75762790 to register the mark IZZY'S
PIZZA BAR CLASSIC BUFFET was rejected on the basis of
respondent's registration (now sought to be cancelled
herein), states that "if it were not for the final refusal
of this trademark application, [petitioner] would not have
filed for cancellation of my trademark registration as these
actions happened in sequence."  Mr. Rind also indicates that
"[petitioner] never asked me for a consent to the
registration of their refused trademark, but I offered to
consent to the registration of [petitioner's] mark after

28

receiving notice of this cancellation proceeding, but [petitioner] refused to accept my consent."[14]

A petitioner must be shown to have had actual knowledge or constructive notice of a registrant's trademark use to establish a date of notice from which a delay for purposes of laches can be measured. Contrary to the gist of respondent's argument that petitioner had constructive notice of respondent's "registration" when his underlying application was published for opposition, publication of a mark in the Official Gazette does not provide such constructive notice. The Board recently ruled that, in the absence of actual notice prior to the close of the opposition period, the date of registration is the operative date for calculating laches. Teledyne Technologies, Inc. v. Western Skyways, Inc., 78 USPQ2d 1203, 1210 (TTAB 2006), aff'd unpublished op., Appeal Nos. 2006-1366, -1367 (Fed. Cir. Dec. 6, 2006).

Respondent's registration issued on February 2, 1999; therefore, petitioner was put on constructive notice of respondent's trademark on that date. There is nothing in the record to indicate that petitioner had actual notice of the registration or respondent's use of the mark prior to this date. The petition for cancellation was filed on

---

[14] When petitioner failed to respond to the final refusal against its then-pending application Serial No. 75762790, the application was abandoned on August 7, 2001.

January 27, 2004.  Thus, the length of petitioner's delay in filing the petition is just six days short of five years.

The length of delay between notice and filing a petition for cancellation is a factor when considering a laches defense.  See, e.g., Teledyne Technologies, Inc. v. Western Skyways, Inc., 78 USPQ2d at 1210 [3 years, 8 months of unexplained delay held sufficient for laches]; and Charrette Corp. v. Bowater Communication Papers, Inc., 13 USPQ2d 2040 (TTAB 1989) [14 months of delay held not sufficient for defense of laches].

In the context of this case, we find that the almost five year period of delay between the issuance of the registration and the filing of the petition for cancellation constitutes undue delay.  We find this based on petitioner's threatening letters to respondent in June 2000 and October 2000 (accompanying the latter correspondence was a copy of a petition to cancel respondent's registration), coupled with petitioner's failure to take action until 2004.

Further, during this period of delay, respondent expanded its business and opened a second restaurant.  Mr. Rind testified that respondent continued to use his mark and expand his business "in good faith because of [petitioner's] silence...under the belief that [petitioner] was not opposed to my use of my mark."  Thus, there has been detriment to respondent due to the delay.

30

Under normal circumstances, petitioner's undue delay, coupled with respondent's detriment based on petitioner's inaction, would compel a finding of laches in this case. However, this case involves extenuating circumstances that significantly impact the equities in considering laches, namely, respondent expanded his menu in September 2003 to add pizza. Petitioner promptly filed its petition thereafter.

Thus, although we have found undue delay by petitioner in taking action, and prejudice to respondent resulting from the delay, we cannot determine that respondent has established the defense of laches until we examine whether petitioner has, as it contends, an adequate excuse for the delay. See Leinoff v. Louis Milona & Sons, Inc., 726 F.2d 734, 220 USPQ 845 (Fed. Cir. 1984).

Before considering the special circumstances presented by respondent's expansion into serving pizza (see discussion, infra), we will first consider the reasons petitioner has offered that we do not find to be reasonable excuses for its inaction.

A common reason given for delay is "other litigation." See Cuban Cigar Brands N. V. v. Upmann International, Inc., 457 F.Supp. 1090, 199 USPQ 193 (SDNY 1978), aff'd without op., 607 F.2d 995 (2d Cir. 1979). Petitioner offers this as its primary excuse for the delay. According to Mr. Jansen,

petitioner "has enforced its trademark rights against other parties as the need has arisen."  More specifically, Mr. Jansen points to Cancellation Nos. 92031947 and 92043710 filed April 13, 2001 and September 17, 2004, respectively. No other Board proceedings or civil actions are mentioned.[15]

Upon close inspection, this reason hardly is sufficient.  Cancellation No. 92043710 was filed eight months after the filing of the present petition; thus, Cancellation No. 92043710, commencing in September 2004, does not support petitioner's statement that it was "busy pursuing other cancellation proceedings" so as to delay the filing of the petition to cancel respondent's registration in January 2004.

As to the one legal action brought by petitioner prior to its petition against respondent's registration herein, Cancellation No. 92031947 was filed in April 2001.  Office records show, however, that the proceeding was concluded (in petitioner's favor) in November 2001; thus, this litigation was concluded more than two years before the filing of the present petition.  Moreover, the record is devoid of evidence that petitioner gave notice to respondent that it

---

[15] Although not specifically mentioned by Mr. Jansen, petitioner also filed a notice of opposition against a third-party's application (as evidenced by exhibit no. 10 made of record by petitioner's notice of reliance).  That notice of opposition, however, was filed in June 2004, that is, five months after the filing of the present petition.  Thus, as is the case with

was delaying a petition to cancel until conclusion of the other proceeding. See Hottel Corp. v. Seaman Corp., 833 F.2d 1570, 4 USPQ2d 1939, 1940-41 (Fed. Cir. 1987), overruled in part, A.C. Aukerman Co. v. R.L. Chaides Construction Co., 960 F.2d 1020, 22 USPQ2d 1321 (Fed. Cir. 1992) ["For other litigation to excuse a delay in bringing suit there must be adequate notice of the proceeding...The notice must inform the alleged infringer of the other proceeding and of the patentee's intention to enforce its patent upon completion of that proceeding."].

Given that only one legal action preceded the current petition (going by way of default and concluding in less than one year), and that it was concluded more than two years prior to the filing of the current petition, the circumstances do not justify Mr. Jansen's statement that "[t]he expense and distraction of ongoing trademark enforcement has been a factor in the timing of the present [cancellation petition]."

In sum, the "other litigation" excuse offered by petitioner is not persuasive.

Petitioner also attempts to excuse its delay by pointing to its mistaken belief that respondent was located in New York and, thus, petitioner was not threatened by respondent's registration. Mr. Jansen asserts: "I do not

Cancellation No. 92043710, this "other litigation" was not

33

recall Mr. Rind telling me that his bagel shop was in California. Mr. Rind told me he was operating a bagel shop called Izzy's Brooklyn Bagels. I believed during and after the conversation that he was operating a bagel shop in New York." Mr. Jansen offered the following explanation: "Because the federal trademark registrations of [petitioner] are limited to the area comprising the states west of the Mississippi River due to Concurrent Use Proceeding No. 792, [petitioner] was not opposed to [respondent's] use of the Izzy's name in association with a bagel shop in New York."

We do not accept this excuse for petitioner's inaction. The apparent genesis of Mr. Jansen's phone call to Mr. Rind was the citation of respondent's registration as a Section 2(d) bar against the mark sought to be registered in petitioner's application serial no. 75762790 (petitioner's exhibit no. 6, copy of Office action dated November 15, 1999). The Office action indicated that a copy of respondent's registration was attached to the Office action. Respondent's California address is clearly indicated on the registration certificate.[16] Further, one might assume that Mr. Jansen knew, from the telephone number that he called, where respondent was located.

---

brought until after the filing of the present petition.
[16] In saying this, we recognize the uncertainty of whether Mr. Jansen personally ever saw a copy of the cited registration.

We also note that petitioner's counsel's letters in June and October 2000 were sent to the California address of

respondent's counsel.

Given these circumstances, Mr. Jansen's claim of ignorance does not suffice as an excuse. In any event, respondent's registration has no geographical restrictions, thereby affording respondent nationwide rights that include petitioner's area.

Lastly, petitioner contends that it was justified in its delay in that "petitioner filed its petition within a few months of learning that respondent had begun offering pizza, petitioner's staple good." (Brief, p. 25). In this connection, Mr. Jansen specifically testified, in pertinent part, as follows:

> In September 2003, I became aware that the Izzy's Brooklyn Bagels restaurant appeared no longer to be merely a bagel shop, but instead also was advertising pizza on its web site. In addition, the Izzy's Brooklyn Bagels website did not show the mark IZZY'S BROOKLYN BAGELS THE AUTHENTIC FLAVOR KOSHER (AND DESIGN) as it was registered. The term "Izzy's" was centered and in a large font, not diminutive as shown in the trademark registration. Because pizza is a large part of the business of [petitioner] and is widely associated with the IZZY'S marks of [petitioner], the change in the menu of the Izzy's Brooklyn Bagels restaurant and web site made it apparent that customer confusion would inevitably result from the simultaneous use of the IZZY'S marks owned by [the parties]. Promptly after learning of the changes in the menu of the Izzy's Brooklyn Bagels restaurant and web site, [petitioner] filed this Cancellation Proceeding on January 27, 2004.

36

Petitioner is essentially asking the Board to apply a form of the doctrine of encroachment in this inter partes proceeding.  Professor McCarthy indicates that "[l]aches should not necessarily always be measured from defendant's very first use of the contested mark, but from the date that defendant's acts first significantly impacted on plaintiff's good will and business reputation...any change in the format or method of use of the mark or expansion into new product lines or territories should be sufficient to excuse a prior delay."  McCarthy on Trademarks and Unfair Competition, § 31:19 (4th ed. updated 2006).  Professor McCarthy further explains:

> Under the doctrine of "progressive encroachment," a trademark owner is not forced by the rule of laches to sue until the likelihood of confusion caused by the accused use presents a significant danger to the mark.  A relatively low level infringement or use of a similar mark in a different product or service line or in a different territory does not necessarily trigger an obligation to immediately file suit. But when the accused use moves closer or increases in quantity, the doctrine of progressive encroachment requires the trademark owner to remain alert and to promptly challenge the new and significant acts of infringement.  Thus, there may be no obligation to sue until the accused use progressively encroaches on the trademark.

McCarthy on Trademarks and Unfair Competition at § 31:20.

The Court, in ProFitness Physical Therapy Center v. Pro-Fit Orthopedic and Sports Physical Therapy P.C., 314 F.3d 62, 65

37

USPQ2d 1195, 1199-1200 (2d Cir. 2002), explained the doctrine:

> By using the mark in a different manner or in a new geographic area, a defendant may exceed the scope of the plaintiff's consent and be exposed to liability for that extra-consensual use...The doctrine of progressive encroachment...focuses the court's attention on the question of whether the defendant, after beginning its use of the mark, redirected its business so that it more squarely competed with plaintiff and thereby increased the likelihood of public confusion of the marks.

See also Westchester Media v. PRL USA Holdings, Inc., 214 F.3d 658, 55 USPQ2d 1225 (5th Cir. 2000) [Ralph Lauren, owner of the POLO mark for clothing and accessories, was not guilty of laches in suing POLO magazine when the magazine began featuring mainstream fashion news, despite the fact that it took no action against the magazine during the twenty years when it was an insider's publication devoted to the sport of polo: "The new POLO Magazine's emphasis on fashion, affluent lifestyle and travel can plausibly lead consumers to believe that Ralph Lauren is associated with the new POLO Magazine."]; Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 38 USPQ2d 1449 (4th Cir. 1996) [defense of laches is not appropriate where defendant expanded from sales in upscale department stores to sales in food, drug and mass merchandising outlets; because plaintiff only sold in the latter category, it was doubtful that likely

confusion could have been proven prior to defendant's expansion into plaintiff's marketing environment]; and Sun Microsystems v. SunRiver Corp., 36 USPQ2d 1266, 1271 (N.D. Cal. 1995) [defense of laches is not available to a defendant who expanded its use of the mark to product lines that are competitive with plaintiff; this is "a fact which dramatically increases the likelihood of confusion"; preliminary injunction granted]. One court stated that the senior user has no obligation to sue until "the likelihood of confusion looms large" and that "[O]ne cannot be guilty of laches until his right ripens into one entitled to protection. For only then can his torpor be deemed inexcusable." Johanna Farms, Inc. v. Citrus Bowl, Inc., 468 F.Supp. 866, 199 USPQ 16, 28 (EDNY 1978). As Professor McCarthy further explains, the rule of "encroachment" allows a "plaintiff to tolerate de minimis or low-level infringements and act promptly when a junior user either gradually edges into causing serious harm or suddenly expands or changes its mark. The law should not require a trademark owner to make a headlong rush to litigation." McCarthy on Trademarks and Unfair Competition at § 31:21. In this connection, Professor McCarthy quotes the Restatement:

> The doctrine [of laches] is not intended
> to encourage precipitous litigation, and
> a trademark owner is not required to
> take action at the first indication of a

> possible infringement.  The plaintiff is not ordinarily chargeable with delay prior to an actual intrusion upon its rights.

<u>Restatement (Third) of Unfair Competition</u>, § 31, comment c (1995).  See Tandy Corp. v. Malone & Hyde, Inc., 769 F.2d 362, 226 USPQ 703 (6th Cir. 1985), <u>cert. denied</u>, 476 U.S. 1158, 106 C. Ct. 2277 (1986) ["A reasonable businessman should be afforded some latitude to assess both the impact of another's use of an allegedly infringing trademark as well as the wisdom of pursuing litigation on the issue."].

All of the above discussion and case law pertain to common law rights and trademark infringement actions. Therefore, we must consider the applicability of the "encroachment" doctrine in cancellation proceedings.

"Equity," as defined by <u>Black's Law Dictionary</u> (1979), means "[j]ustice administered according to fairness as contrasted with the strictly formulated rules of common law."  As noted by our primary reviewing court, "[l]aches is 'principally a question of the inequity of permitting the claim to be enforced — an inequity founded upon some change in the condition or relations of the property or the parties.'"  Bridgestone/Firestone Research Inc. v. Automobile Club de l'Ouest de la France, 58 USPQ2d at 1463 [citation omitted].  Laches is applied at the informed discretion of the Board and, in the words of Professor McCarthy, equitable defenses "must be applied in an

atmosphere of common sense with an eye to basic fairness."

McCarthy on Trademarks and Unfair Competition at § 20:73.

To quote the predecessor of our primary reviewing court:

"Registrant's [laches or acquiescence] defense is, after

all, an equitable one.  We do not scan petitioner's history

for one fatal misstep.  We sustain petitioner's rights in

the absence of a showing that to do so would work *injustice.*

Ralston Purina Co. v. Midwest Cordage Co., Inc., 373 F.2d

1015, 153 USPQ 73, 77 (CCPA 1967) [emphasis in original].

Further, "equity does not seek for general principles, but

weighs the opposed interests in the scales of conscience and

fair dealing."  Nark, Inc. v. Noah's, Inc., 212 USPQ 934,

944-45 (TTAB 1981), quoting Dwinell-Wright Co. v. White

House Milk Co., Inc., 132 F.2d 822, 56 USPQ 120, 122 (2d

Cir. 1943).

The concept of laches, thus, essentially acts as an

exception for issuing a judgment in favor of a party that

has proved its case; that is, although "at law" the

plaintiff would be entitled to judgment, the defendant has

shown special circumstances that would make the application

of strictly formulated rules of law unacceptable.  The

defense of laches is not determined by adherence to rigid

legal rules; rather, we analyze laches by a consideration of

the specific facts and a balancing of the respective

interests and equities of the parties, as well as of the general public.

When we examine the laches defense in the context of respondent's expansion of his "restaurant services featuring bagels as a main entrée" into pizzas, we find that respondent has not shown that, despite petitioner's showing of a likelihood of confusion, "the scales of conscience and fair dealing" should tip in favor of respondent.

Respondent has identified the services in his registration as "restaurant services featuring bagels as a main entrée." This recitation of services clearly indicates that the services cover a specific type of restaurant, that is, one featuring bagels. Respondent's restaurant concept is also clearly conveyed by the registered mark comprising, in part, the words "BAGELS" and a design of a boy carrying a basket full of bagels.[17] In this connection, we note the language of respondent's attorney in his October 31, 2000 letter to petitioner's attorney:

> The food in question is distinctly
> different and not subject to confusion.
> Your client's described goods and
> services are distinctly pizza,
> "Italian," and pasta oriented. Our
> client's described goods and services
> are distinctly bagels, "Jewish" and
> kosher oriented.

---

[17] Respondent's attorney, in discussing his client's mark in his October 31, 2000 letter to petitioner's attorney, conceded that "[h]ad all of these items been of pizzas [in the basket carried by the boy], your claim would have marginally more merit."

Further, on his website, respondent's restaurant is described as a "bagel bakery."

Because respondent changed the nature of his "restaurant services featuring bagels as a main entrée" in September 2003, he is not entitled to rely on petitioner's inaction prior to that time. Essentially, the change in respondent's services, from "restaurant services featuring bagels as a main entrée" to restaurants that also serve pizza and other Italian food, constituted such a change in circumstances that petitioner's previous failure to take action against the registration does not preclude petitioner from taking action against the registration when it learned of the change. That is, respondent may have reasonably relied on petitioner's prior inaction against his registration when he was providing only restaurant services featuring bagels as a main entrée so that, in justice, laches would lie as a defense against petitioner's claim of likelihood of confusion. However, when respondent changed his services to include offering pizza and other Italian food, a change petitioner could not have reasonably foreseen, petitioner cannot be said to have unreasonably delayed in taking action during the period commencing with the issuance of the registration until 2003, when that change occurred. Respondent not only made a change in his services, but the change was to add pizza, the specific food

43

item that is the focal point of petitioner's restaurant services. Because petitioner brought this cancellation proceeding in January 2004, shortly after learning about the changes in respondent's activities, petitioner's earlier delay in taking action is excused, and petitioner therefore is not guilty of laches.[18] Given respondent's change in the nature of his services, granting petitioner a remedy on its likelihood of confusion claim works no injustice as respondent's actions do not merit protection through application of equitable principles.

Respondent's argument that he is selling pizza under a different mark, "UNCLE LUIGI," is not persuasive. This branding has no effect on the restaurant services covered by the registration at issue. Further, and in any event, the effect of respondent's attempt to differentiate the branding of his restaurant and his pizza is diminished by the fact that the pizza box reads "Uncle Luigi at Izzy's Brooklyn Bagels."

Accordingly, we find that, due to the change in the nature of respondent's services, petitioner's delay in

---

[18] A different result might very well obtain if respondent's recitation of services had read simply "restaurant services." Such a broad recitation would encompass all types of restaurants, including ones that serve pizza. If that were the case herein, laches might be found based on petitioner's inaction against a registration covering services identical to its own "restaurant services."

bringing the petition for cancellation is excused.  The equitable defense of laches does not apply in this case.

### Inevitability of Confusion

Although we have determined that laches does not apply in this case, we shall turn our attention, for the sake of completeness, to the matter of whether the confusion between the parties' marks is inevitable because, if it is, then the defense of laches in not applicable under any circumstances. Ultra-White Co., Inc. v. Johnson Chemical Industries, Inc., 465 F.2d 891, 175 USPQ 166 (CCPA 1972); and Reflange Inc. v. R-Con International, 17 USPQ2d 1125, 1131 (TTAB 1990) ["It is not necessary to discuss this theory because it is well established that equitable defenses such as laches and estoppel will not be considered and applied where, as here, the marks of the parties are identical and the goods are the same or essentially the same."].  This is so because any injury to respondent caused by petitioner's delay is outweighed by the public's interest in preventing confusion in the marketplace.  Turner v. Hops Grill & Bar, Inc., 52 USPQ2d 1310, 1313 (TTAB 1999), citing Coach House Restaurant Inc. v. Coach and Six Restaurants, Inc., 934 F.2d 1551, 19 USPQ2d 1401, 1409 (11th Cir. 1991).

Although there is a likelihood of confusion between petitioner's "IZZY'S" mark for restaurant services and respondent's logo mark for restaurant services featuring

bagels as a main entrée, we find that the evidence of record does not establish inevitable confusion.

In the present case, the restaurant services are legally identical.  The marks, however, clearly are not identical.  Although we have found the marks to be sufficiently similar to be likely to cause confusion, they are hardly identical.  Respondent's mark includes prominent design features and additional wording.  Thus, we do not view confusion between the parties' marks as inevitable.  Similarly, because there are even greater differences between the mark and services in respondent's registration and those in petitioner's other pleaded registrations, confusion is not inevitable with respect to those registered marks either.

**Decision:**  Respondent's mark for restaurant services featuring bagels as a main entrée is likely to cause confusion with petitioner's mark IZZY'S (stylized) for restaurant services.  We deny respondent's laches defense.  The petition for cancellation is granted.  Registration No. 2221192 will be cancelled in due course.